408 So.2d 1259 (1982)
STATE of Louisiana
v.
Keith C. AMEDEE.
No. 81-KA-1357.
Supreme Court of Louisiana.
January 25, 1982.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Leon Cannizzaro, Kendall Green, Louise Korns, Asst. Dist. Attys., for plaintiff-appellee.
Dwight Doskey of Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
MARVIN, Justice Ad Hoc.[*]
The legal issue in this appeal of a 2d degree murder conviction is whether the *1260 State's evidence of the results of a drug scan made on the victim was admissible to rebut defendant's testimony that the killing accidentally occurred when he struggled with the homicide victim who was acting like he was "on something" (drugs or whatever) and threatened defendant with a gun. CCrP Art. 719. We affirm. State v. Pool, 361 So.2d 1202 (La.1978).
Defendant testified that the victim, whom he had known for about eight years, was acting like he was "on something" [such as drugs], and earlier on the fatal evening had robbed defendant at gunpoint of $10 and a gold chain on the street in the neighborhood where both lived. Defendant sought the assistance of the victim's brother and they unsuccessfully sought to recover the chain and money from victim at victim's apartment. The victim denied taking anything from defendant.
Defendant explained at the trial that the last time he returned to the victim's apartment, the victim again accosted him with a gun. Defendant said that he struggled to take the gun from the victim, that the gun accidentally went off several times and apparently wounded the victim, and that defendant then ran home. Defendant was quickly apprehended by police who heard the gunshots and saw defendant's flight from the scene.[1] Defendant testified that he told the police, when arrested, that he "ain't had nothing to do with it."
The victim's girlfriend testified that her lengthy telephone conversation with the victim was thrice interrupted by the victim's responding to a knock on his door and his then conversing with another person. The first conversations that she overheard she described as "calm" and that the other person was asking about a "chain". The second conversation, about 10 minutes later, mentioned a chain and "$10". The victim's girlfriend said that in the first two conversations she did not overhear any arguing or shouting. In the third conversation, about 10 minutes after the second, the victim's girlfriend overheard the knock on the door, the gunshots, and then the victim say, "Brother, why are you going to kill me over some [thing] like this." She said she did not hear any other voice in this third interruption but that she did hear, after the victim's question, a sound "like somebody falling".
The victim was shot four times in the abdomen and once in the left arm. All of the wounds showed powder burns but there were no powder burns on the victim's hands. The wounds were not instantly fatal and the victim made dying declarations naming defendant as the person who shot him to a policeman and then to his brother before the victim was removed to a hospital where he was pronounced dead from the gunshot wounds.
Defendant's version of the fatal incidentthat he struggled with the victim when the victim, "on something", put a gun in defendant's faceis quoted in footnote one. On rebuttal of defendant's assertion that the victim was "on something", the *1261 State offered the testimony of a toxicologist who made a drug scan or analysis of residual extractions from the contents of the victim's bowels approximately 48 hours after the killing. The toxicologist testified that this drug scan did not reveal the presence of "barbituates, T's and blues, codeine, cocaine, possible p.c.p., morphine and any of the morphine derivatives." The toxicologist explained that "marijuana is not one of the drugs that show up in [the] particular analysis [that she conducted]."
CCrP 719 mandates that upon motion by the defendant, the court shall order the district attorney to authorize the defendant to inspect and copy any results or reports of scientific tests material to the case that are in the control or knowledge of the district attorney and that are intended for use at trial. As in Pool, supra, the rebuttal testimony here was not intended for use at trial within the contemplation of the statute.[2] No mention was made of the drug scan in the State's opening statement and the testimony about the drug scan was used as rebuttal evidence and then only to weigh against defendant's testimony that the victim was "on something". The drug scan testimony did not wholly contradict defendant's version that the victim was "on something" because the toxicologist testified that the drug scan tested for specific drugs and, impliedly, not for some others, and expressly not marijuana.
The circumstances under which the toxicological test was admitted are more analogous to Pool, supra, than to State v. Boothe, 310 So.2d 826 (La.1975), and other cases cited by defendant. Defendant admitted having the handgun in his hand when the fatal shots were fired but denied having the specific intent to kill or to cause great bodily harm. La. Cr.C. Art. 30.1. His intent could have been inferred by the jury from the circumstances, including defendant's admissions, his contrary story to the police, the number of wounds, and the testimony of the victim's girlfriend about what she overheard on the telephone. Intent is inferred from circumstances of the crime. LRS 15:445. State v. O'Blanc, 346 So.2d 686 (La.1977).
The State's answers to defendant's discovery implied, but did not affirmatively state, that no toxicological examinations of the victim's body were made.[3] Under these particular circumstances, reversal is not warranted even should we agree with defendant's contention that testimony relating to the drug scan test should not have been admitted under CCrP 719. Pool, supra.
The conviction is AFFIRMED.
LEMMON, J., concurs and assigns reasons.
LEMMON, Justice, concurring.
This is a discovery issue. At the time of the request for discovery the District Attorney did not intend to use the test results at trial.[1] Not until the defendant testified *1262 that the victim acted as if he were "on something" did the test results become relevant, thereby justifying the District Attorney's use of this evidence on rebuttal.
Under these circumstances the non-exculpatory test results constituted unanticipated rebuttal evidence, and the trial judge exercised appropriate discretion in refusing to exclude this evidence. C.Cr.P. Art. 729.5.
NOTES
[*] Judges Pike Hall, Jr., Charles A. Marvin, and Jasper E. Jones, of the Court of Appeal, Second Circuit, participated in this decision as associate justices ad hoc, joined by Chief Justice John A. Dixon, Jr., and Associate Justices Walter F. Marcus, Jr., Fred A. Blanche, Jr., and Harry T. Lemmon.
[1] The gun, described simply as a handgun, was not found. Defendant said:

"I was thinking ... `he must be on something, I know he don't know what he doing' so I started to go back by [the brother] Henry's house and tell him what Juan did. I turned off and I went back by [the victim] Juan's house and I knocked on the door and he come back to the door and he said, `What you want.' He said, `I am on the phone, I don't want to hear all of that.' So I just said, `Why don't you just give me my chain back and we can forget about it.' He say, `I ain't giving you nothing back.' He said, `Hold on, I will give it back to you.' He went in the house and came back out with a gun. He put it in my face and I grabbed it and it went off, seemed like nobody was hit and then it went off a couple more times. Then he fell down and I ran. I ran to my house. I was scared and I stayed inside and the police came and got me. I told them I ain't had nothing to do with it.
"[I had no] ... intentions of killing Juan White.
"[I did not] ... own a gun ...
"[I did not] ... take a gun over there to kill him ..."
[2] In Pool, the State introduced rebuttal testimony that defendant's fingerprint was found in the stolen car even though the State, in responding to defendant's discovery, failed to state that fingerprint comparisons had been made. The court said:

"While it is likely that [this] ... was error, under the particular circumstances ... reversal is not warranted. La.Cr.C.P. Art. 921." 361 So.2d at p. 1204
There the defendant was arrested in the stolen car.
[3] The State answered defendant's inquiry about scientific tests as follows:

"Clothing seized was allegedly submitted ... for tests; however, it is unknown at this time whether any tests have been performed. "If tests are actually done, results will be made known to defendant."
[1] C.Cr.P. Art. 719:

"Upon motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph, or otherwise reproduce any results or reports, or copies thereof, of physical or mental examination, and of scientific tests or experiments, made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial. Exculpatory evidence shall be produced under this article even though it is not intended for use at trial. (Emphasis supplied.)