683 So.2d 1253 (1996)
STATE of Louisiana, Appellee,
v.
Laura DUGAS, Defendant-Appellant.
No. 96-49.
Court of Appeal of Louisiana, Third Circuit.
October 9, 1996.
*1254 Bernard E. Boudreaux Jr., District Attorney, Keith Comeaux, Assistant District Attorney, for State of Louisiana.
Margareta Maria Lahme, Lafayette, for Laura Dugas.
Before DOUCET, C.J., and YELVERTON and PETERS, JJ.
DOUCET, Chief Judge.
On May 27, 1992, the defendant, Laura Dugas, was indicted for second degree murder, a violation of La.R.S. 14:30.1. At the close of a seven day trial, on September 6, 1994, a twelve member jury found the defendant guilty as charged. Later that month, on September 30, 1994, the district court sentenced Ms. Dugas to the mandatory sentence of life imprisonment at hard labor without parole, probation, or suspension of sentence.
The defendant now appeals her conviction and sentence, assigning four errors.

FACTS:
Laura Dugas is charged with shooting to death, her husband, Lonnie Dugas. On the morning of April 7, 1992, the defendant placed a telephone call to Dorothy "Dot" Dugas, the victim's stepmother. The defendant was calm at first, but then became agitated, and told Ms. Dugas that something had happened to the victim. No longer calm, the defendant was crying, and exclaiming "Oh, my God." Dot Dugas volunteered to come help the defendant see what was wrong. As she drove to the defendant's home Dot Dugas flagged down a state trooper, Sergeant Richard Hazelwood, who followed her to the defendant's home.
Upon arriving, Sgt. Hazelwood noted the victim's body, prostrate in the yard, with several apparent bullet holes. Hazelwood secured the scene and contacted the St. Martin Parish Sheriff's Office, Acadian Ambulance, and the Coroner's Office. The sheriff's office responded, and took over the investigation.
Laura Dugas answered some questions at the scene, and was taken to the sheriff's office to give a statement. After her initial responses, the defendant was considered a suspect and, upon arriving at the sheriff's office, deputies Mirandized her. She then gave an audio-recorded statement wherein she stated she had no part in the crime, and *1255 did not know who had shot her husband. The defendant referred to a third party who had allegedly come to the house several weeks before the shooting, apparently trying to shift suspicion.
Subsequently, Captain Lou Potier (now retired from the sheriff's office) interviewed the defendant, who then made a full confession. Laura Dugas also agreed to have her confession, including a re-enactment of the crime, videotaped.
On the video, the defendant said she and the victim had been arguing about the wearing of wedding rings, and a possible family vacation to Disney World; she also indicated she was unsatisfied with their sexual relationship. Further, she stated that at some earlier point she had removed a .22 caliber pistol from the victim's truck, and on the morning of the murder she concealed it in a garbage bag as she helped him carry out the trash. They continued arguing as they carried out the trash; she put her bag in the truck and then shot the victim. She stated that he ran, calling for help, and asking her not to shoot him anymore. The defendant continued to shoot her husband, striking him with a total of 10 rounds (or 9 rounds and a stray fragment). When he fell to the ground, she placed his wedding ring on his finger. It was found there when the body was discovered.

ERRORS PATENT:
La.Code Crim.P. art. 920 provides the scope of review on appeal, as follows:
The following matters and no others shall be considered on appeal:
(1) An error designated in the assignment of errors; and
(2) An error that is discoverable by a mere inspection of the pleadings and proceedings without inspection of the evidence.
In accordance with this article, all appeals are reviewed by the court for errors patent on the face of the record. This review reveals three (3) errors patent.
First, the record does not specifically state the defendant was present when judgment was rendered, as required by La.Code Crim.P. art. 831. However, the surrounding circumstances in the record indicate the defendant was present. The record reveals that after the jury was polled, and sentencing set, she was taken out of the courtroom. Thus, the defendant's case was not prejudiced, and this error, if, indeed it exists, is harmless.
Next, we observe La.Code Crim.P. art. 642 provides:
The defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed.
The defense filed an application for appointment of a sanity commission, and for a hearing on the defendant's capacity to proceed, on April 21, 1992; three (3) days later, defense counsel was notified a "sanity commission hearing" had been set for May 1, 1992. No further action on this motion appears in the record. However, a psychologist's affidavit was filed as a defense exhibit in a bond hearing held June 15, 1992. The affidavit indicates Laura Dugas is no danger to the community, and lacks psychotic or sociopathic tendencies.
The court contacted the clerk of court's office, pursuant to La.Code Crim.P. art. 914.1 D., which authorizes this court to designate additional portions of the record. The clerk's office certified the scheduled hearing was not held on May 1, 1992, that no ruling on the original motion appears in the record, and that no sanity commission was appointed. Thus, it appears the district court never ruled on the motion.
In State v. Gowan, 96-488 (La.3/29/96), 670 So.2d 1222, the Louisiana Supreme Court, in granting the state's application for a writ of certiorari, stated:
Granted. The present case is distinguishable from State v. Nomey, 613 So.2d 157 (La.1993), since the trial judge never ruled on defendant's motion for appointment of a sanity commission. Unlike Nomey, there was no threshold determination by the trial *1256 judge that a sanity commission should be appointed. Therefore, by failing to request a hearing on this motion prior to entering his guilty plea, defendant implicitly waived his right to have the motion heard. Accordingly, the judgment of the court of appeal is vacated and set aside and the judgment of the trial court denying post conviction relief is reinstated.
The same situation appears in the case before us. Thus, applying the same reasoning as the supreme court used in Gowan to the present case, we find that "... defendant implicitly waived [her] right to have the motion heard."
Finally, La.Code Crim.P. art. 880 provides that when imposing sentence the court shall give the defendant credit for time spent in actual custody prior to the imposition of sentence. The record indicates the trial court did not do so. Thus, we amend the sentence to reflect that defendant is given credit for time served prior to the imposition of the sentence. See La.Code Crim.P. art. 882 A. Resentencing is not required; however, we remand this case and order the district court to amend the commitment and minute entry of the sentence to reflect that the defendant is given credit for time served. State v. Moore, 93-1632 (La.App. 3 Cir. 5/4/94), 640 So.2d 561, 564, writ denied,94-1455 (La.3/30/95), 651 So.2d 858.
This may seem anomalous, as the defendant received a mandatory life sentence. However, the jurisprudence shows Article 880 applies even to life sentences. See, e.g. State v. Howard, 626 So.2d 459 (La.App. 3 Cir.1993); State v. King, 604 So.2d 661 (La. App. 1 Cir.1992).

ASSIGNMENT OF ERROR NO. 2:
By this assignment, Dugas argues the evidence against her was insufficient to support the conviction. We address this argument first, under State v. Hearold, 603 So.2d 731 (La.1992).
When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La. 1983); State v. Duncan, 420 So.2d 1105 (La. 1982); State v. Moody, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the credibility of the respective witnesses, and therefore the appellate court should not second guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See State ex rel. Graffagnino, 436 So.2d 559, citing State v. Richardson, 425 So.2d 1228 (La.1983). In order for the state to obtain a conviction, it must prove the elements of the crime beyond a reasonable doubt.
Laura Dugas was convicted under La.R.S. 14:30.1, which states:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or

* * * * * *
Her defense was based upon "justifiable homicide," defined by the following applicable paragraphs of La.R.S. 14:20:
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger; or

* * * * * *
As the trial judge noted during the jury charge, Dugas bore no burden of proof; the state had to prove she did not act in self-defense. There is no question; Laura Dugas shot Lonnie Dugas; the key inquiry goes to the circumstances immediately surrounding the shooting.
The defendant has told more than one version of what happened. At trial, she said that as they walked outside to put bags of trash in the victim's truck, the couple was arguing over whether to take their son to Disney World. The victim became incensed, *1257 back-handed her so hard she fell into the truck's open doorway, and threatened her with anal rape (she alleged he had anally raped her earlier that morning). The defendant stated she saw the victim's .22-caliber pistol in the truck, grabbed it and shot him because she feared a beating.
In support of her claims, the defendant testified their 16 year marriage had been riddled with gradually-worsening psychological and physical abuse, including repeated instances of forcible non-consensual anal sex. Defense witnesses were able to corroborate some instances of physical abuse, although many of the incidents about which Laura Dugas testified would have occurred "behind closed doors."
Our review of the voluminous record indicates there were past instances of abuse, and Laura Dugas may well have felt genuine fear on the morning of the shooting. However, even accepting the version of events she presented at trial, the killing of Lonnie Dugas could not reasonably be characterized as self-defense. The medical and forensic testimony showed the victim was shot nine or ten times, including shots from behind. A neighbor, who could not see the shooting, testified he heard the shots come in groups: five (5), then three (3), then one (1). Before the final shot, he heard moaning.
Even if the defendant fired an initial shot or group of shots while in reasonable apprehension of danger, the sheer number of shots is inconsistent with legitimate self-defense. Again, we note two or three were shots in the back. And while the exact times and distances are unclear, the defendant's own testimony indicates that at some point the victim was moving away from her and the truck, yet she still fired more shots.
Further, we viewed defendant's videotaped confession, S-15, in which she states she fired continually at her husband, even as he tried to flee and call for help. The scenario she describes on the tape seems consistent with the medical and forensic testimony, and with what the neighbor heard (although he heard only shots and moans).
We find nine or ten shots are inconsistent with self-defense; shots in the back are inconsistent with self-defense; and shots while an unarmed victim moves away are inconsistent with self-defense. Additionally, we note the victim was approximately two (2) feet (or more) away from the defendant when the first shots were fired.
Therefore, this assignment lacks merit.

ASSIGNMENT OF ERROR NO. 1:
By this assignment, the defendant alleges the district court erred in granting the prosecution's gender-based Batson motion during jury selection. The defendant alleges: 1) the state failed to establish a prima facie case of gender discrimination, and 2) the defense produced a gender-neutral basis for the exclusion, in that juror Wisdom was "smirking" during voir dire.
Juror Wisdom, who eventually became jury foreman, had been accepted by both sides and was sworn at the end of the first day's voir dire. However, the defense attempted to peremptorily strike him before the final swearing of the panel. Prosecutors made a Batson motion, alleging white males were being systematically excluded from the jury. The judge upheld the motion, thereby obviating the defendant's peremptory challenge.
Use of Batson is well-established in Louisiana jurisprudence:
The Supreme Court in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), held that the Equal Protection Clause of the U.S. Constitution prohibits the state from challenging potential jurors solely on account of their race. Batson has been codified by the Louisiana legislature in LSA-C.Cr.P. Art. 795(C). In Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), and Georgia v. Carr, 506 U.S. 801, 113 S.Ct. 30, 121 L.Ed.2d 3 (1992), the Supreme Court extended Batson to hold that a criminal defendant may not violate the equal protection rights of venirepersons solely because of race. To allow prospective jurors to be excluded because of group bias, whether at the hands of the state or the defense, would undermine public confidence in criminal justice. See also, State v. Knox, 609 So.2d 803 (La.1992).

*1258 Whenever a prosecutor or defense counsel makes a Batson objection, he/she is required to establish a prima facie case of purposeful discrimination. Such a prima facie case is shown when the pertinent circumstances raise an inference that the defense counsel or prosecutor used peremptory challenges to exclude venire members of a cognizable racial group from serving on the jury solely because of race. State v. Rose, 606 So.2d 845 (La.App. 2d Cir.1992) (citations omitted).
Once a showing of prima facie discrimination has been made, the burden shifts to the one seeking to strike the prospective juror to come forward with a race-neutral explanation for the challenge. While that explanation need not rise to the level of a challenge for cause, it is insufficient to merely state an assumption or intuitive judgment that the excused venireperson would not be impartial because of his/her racial identity. The explanation must be clear, racially neutral, reasonably specific and related to the case at bar. State v. Rose, 606 So.2d at 850 (citations omitted).
In the instant case, the victim was white and defendant was African-American. Defendant had 12 peremptory challenges and struck both white prospective jurors in the first panel. By seeking reasons from defense counsel for the challenges, the trial court implicitly found a prima facie showing of discrimination. The burden then shifted to defendant to come forward with racially neutral explanations for the challenges of Lilliam [sic] Lagars and James McLamb.
Defendant offered no explanation for the peremptory challenge of Lillian Lagars. Thus, the trial court correctly sustained the state's Batson objection to defendant's attempt to peremptorily excuse this prospective juror.
State v. Wilson, 25775, 25776 (La.App. 2 Cir. 2/23/94), 632 So.2d 861, 863-864.
In the present case, the district court gave extensive reasons for his holding:
When we had the third group of fourteen up and after the voir dire was completed, we, of course, again got to where we had twelve. And then, after Mr. Courville, we had three ladies in a row. And at that point, the defense had already reached back and challenged Mr. Pharr, who was in the second group of fourteen and who had been accepted by both sides and preliminarily sworn. At that point, Mr. Comeaux made his Batson objection. I felt that there were gender-neutral reasons that the defense had for peremptorily challenging Mr. Pharr, and I denied the Batson objection.
Now, let's bear in mindand Idon't know what the defense reasons was for making thefor going back on the peremptory challenge on Pharr. Maybe it was to exclude white males. But, regardless, I felt there was a gender-neutral reason for it, based on the voir dire, and I denied the Batson objection.
Now, if my notes are straight here and correct, the last five peremptory challenges by the defense were white males: Murray, Standridge, Pharr, Thibodeaux, and then the attempt to challenge Wisdom. At any rate, after I denied the Batson objection, the defense challenged Thibodeaux. The State didn't renew the Batson objection. And what we were doing at that point was both sides were saying they would accept a woman juror. The State would, the defense would, and then said, "But we reach back and challenge", whoever it might be. And in that way, we kept from getting at twelve.
Now, when Miss Trahan was accepted, which would have made twelve, the defense reached back and peremptorily challenged Wisdom. At that point, the State re-urged the Batson objection. Had the defense not urged the challenge, we would have had twelve with Trahan.
The defense could not give me a gender-neutral reason for exercising its challenge on Wisdom. I listened to the reasons. I did not see that in the voir dire, nor did I see the expressions complained of at all. And I wasand I watched sufficiently. A gender-neutral reasons was not given to me. And considering that I felt that the State had made a prima facie showing based on what I've just said, II sustained the Batson objection and denied the *1259 peremptory challenge of Wisdom. That alongand, of course, I gave both sides another chance, since that would have made twelve, to reach back again. And we ended up where we were with Trahan being the twelfth juror.
Although Article 795 deals only with race, I think there's no question but I have to extend the language to include gender. That's the law of the land. I have no choice in the matter.
I think that covers it.
Although the term "white male" was much used during the Batson discussion, the jurors' race was not at issue; the victim was a white male, and the defendant is a white female. State exclusion of male jurors in a paternity case was subjected to Batson in J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), thus extending Batson to gender, State v. Ford, 26,422 (La.App. 2 Cir. 9/21/94), 643 So.2d 293. Thus, we find the lower court was correct in applying Batson to the case sub judice.
As to the defendant's argument that a prima facie case of gender discrimination was not shown, it appears from the judge's comments that juror Wisdom was the fifth white male excluded from the jury panel by defense peremptories; the defendant appears to acknowledge Wisdom was at least the third. She does not offer specific argument as to this fact.
Having found a prima facie case of gender discrimination, the district court then required a gender-neutral explanation from the defense. Counsel said Wisdom had not faced them during voir dire, and had been smirking. The judge disputed this, based upon his own courtroom observations.
The case law indicates district court decisions on Batson challenges are entitled to deference. This circuit has previously used the "abuse of discretion" standard on review. State v. Rice, 626 So.2d 515 (La.App. 3 Cir. 1993). Reviewing the record based on that standard, we are unable to say the lower court abused its discretion.
For the reasons discussed, this assignment also lacks merit.
ASSIGNMENT OF ERROR NO. 3:
By this assignment, the defendant argues ineffective assistance of her counsel; a claim for ineffective assistance of counsel is properly raised in an application for post-conviction relief. State v. Burkhalter, 428 So.2d 449 (La.1983). This enables the district judge to order a full evidentiary hearing on the matter. State v. Seiss, 428 So.2d 444 (La.1983). However, where the record contains evidence sufficient to decide the issue, and the issue is raised on appeal by an assignment of error, the issue should be considered.
The defense argues the trial counsel were ineffective, in that they failed to produce expert witnesses in psychiatry/spousal abuse. According to the defendant's brief, such experts "would have been able to testify as to her defective mental condition, the effect of administration of excessive drugs to her by her physician and her inability to cope with the constant physical, mental, and sexual abuse." The state points out the defense joined in a stipulation not to use such experts, and argues the defendant's counsel were employing sound trial tactics.
Having reviewed the briefs and the record, we find we cannot consider the present claim with this appeal. The state's brief, in particular, bases a number of its arguments upon events that occurred pre-trial and thus are not fully developed in the present record.
Therefore, we find there is insufficient evidence in the record to decide this issue. This is a matter which must be raised, in the district court, through a motion for post-conviction relief. La.Code Crim.P. art 924, et seq. Accordingly, this assignment will not be considered.

ASSIGNMENT OF ERROR NO. 4:
Under this, her fourth and final assignment, the defendant alleges the district court erred by admitting into evidence a sixteen (16) year-old letter from the defendant to the victim. Trial counsel had objected, arguing the letter was undisclosed Brady material, and was more prejudicial than probative.
*1260 Prosecutors introduced the letter on rebuttal. During the defendant's case in chief she testified the victim had repeatedly forced her to have anal sex in the recent years of their marriage, and had done so again during the night/early morning hours before the shooting. Also, Ms. Dugas testified anal intercourse had not taken place early in her relationship with the defendant.
Thus, the state introduced the letter to show the defendant had engaged in anal intercourse with the victim very early in their relationship, i.e., sixteen years ago, and, at that time, had done so consensually. The defense complained the letter was too old to be relevant, but the court found the material had a direct bearing on Ms. Dugas' testimony.
The letter is rather explicit, therefore we will summarize the contents: the defendant describes the pleasure she received from her sexual activities with the victim, briefly listing the physical positions the pair assumed during said activities. Most pertinently, she includes "balling from behind" on the list. On admitting the letter, the prosecution argued the term referred to anal sex. The defense countered that it could just as easily refer to vaginal sex from a posterior entry.
The trial judge found the letter was relevant, noting the defendant's testimony about the victim's alleged propensity for anal sex. The meaning of the phrase at issue was a fact question for the jury, according to the court. Further, the defendant was available for cross-examination and, under subsequent questioning, stated the term referred to vaginal sex.
A trial judge's decisions as to admissibility of evidence are reviewed under the "abuse of discretion" standard. State v. Mayeaux, 570 So.2d 185 (La.App. 5 Cir. 1990); writ denied, 575 So.2d 386 (La.1991). We note a pair of fifth circuit cases that highlight relevancy issues in the use of letters as evidence.
In State v. Brown, 95-124 (La.App. 5 Cir. 5/30/95), 656 So.2d 1070, the defendant had written threatening letters to potential witnesses in an extortion case against him. He was then tried for intimidation of witnesses, and the letters were introduced. The defense claimed parts of the letters were inadmissible, because they referred to other crimes. The fifth circuit upheld the trial court's determination that the references showed the defendant had the wherewithal to harm the witnesses, and was not making mere "idle threats." Thus, the letters were admissible in their entirety, as they were probative of an integral part of the intimidation offense.
In State v. Tammetta, 624 So.2d 433 (La.App. 5 Cir.1993), a high school teacher was convicted of four counts of indecent behavior with students. At trial, Tammetta offered the testimony of the long-term substitute who replaced him. On the first day of school, one of the alleged victims handed the substitute a note. The note stated that if the class did not like the substitute, they would get rid of her. The note was destroyed in good faith before trial, and the district court excluded the substitute's testimony regarding it. In the lower court's view, such testimony was more prejudicial than probative.
The appellate court disagreed, holding the testimony about the note should have been admitted, since it related to credibility and possible corruption of the witnesses.
In the case sub judice, the defendant's letter related to issues of credibility, and to an integral part of Laura Dugas' defense. As the district court noted, the letter clearly would have been admissible if it had explicitly referred to "anal sex." As it contained a more ambiguous term, the judge left the factual determination of the phrase's meaning to the jury. We cannot say this action rises to the level of abuse of discretion.
Additionally, the defense makes two (2) arguments not raised at trial. We, however, will address them in the interests of justice, and of judicial economy. La.Code Crim.P. art. 920(1), Uniform RulesCourts of Appeal Rule 1-3, State v. Durosseau, 626 So.2d 51 (La.App. 3 Cir.1993), writs denied, 93-3003 (La.5/13/94), 637 So.2d 1065, 94-2423 (La.1/13/95), 648 So.2d 1338.
Ms. Dugas claims the letter should have been provided to her, pretrial, in accordance with Brady v. Maryland, 373 U.S. 83, *1261 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as it was exculpatory. This claim is factually at odds with defendant's argument that the letter was inadmissible because it was prejudicial. Nothing in the defense argument indicates how the letter is exculpatory, nor how it is both exculpatory and prejudicial.
The defense also argues that because the letter represents a statement by the defendant, it should have been produced as part of normal discovery, citing La.Code Crim.P. art. 716. The state counters that the letter was not "intended for use at trial," but was only used to rebut Laura Dugas' claim that anal sex was a late, nonconsensual activity in her relationship with the victim. See, e.g., State v. Gonzales, 501 So.2d 824, 826 (La.App. 4 Cir.1986) wherein the court stated:
The phrase `intends to offer in evidence at the trial' has not been interpreted in our jurisprudence. However, a similar phrase from a similar code article was interpreted by our Supreme Court in State v. Pool, 361 So.2d 1202 (La.1978). This case dealt with Article 719 which requires the state to allow the defendant to inspect or copy any results or reports of physical or mental examinations and of scientific tests or experiments `intended for use at trial'. In Pool, the Court held that introduction of evidence brought out on cross-examination by the defense and expounded upon by the State during redirect was not reversible error because the state had not intended to use it as evidence at the trial within the meaning of Article 719. The Court felt that the fact that this information was not brought out by the State on direct examination and had not mentioned it in their opening statement proved the State had `no intent to use the evidence at trial'.
In State v. Amedee, 408 So.2d 1259 (La. 1982) the Court reiterated this interpretation of the phrase. Here, the State offered evidence of a drug tests of the victim during its case in rebuttal to counter the defendant's claim that the victim was `on something'. The Court stated `the rebuttal testimony here was not intended for use at trial within the contemplation of the statute.'
We conclude that the facts in the case at bar are similar to Pool and Amedee. The testimony of Officer Sherman was introduced to rebut the defendant's testimony that the gun was not his. The State did not intend to offer this statement into evidence at the trial within the meaning of Article 716(B).
In the case sub judice, the state neither mentioned the letter in its opening statement, nor introduced it as part of the prosecution's case in chief. Rather, the evidence arose during the state's cross-examination of the defendant.
Accordingly, we find the reasoning in Gonzales applicable to the case at bar and this assignment without merit.

CONCLUSION:
For the foregoing reasons, the defendant's conviction and sentence are affirmed. However, the case is remanded to the trial court, which is ordered to amend the commitment and minute entry to reflect the defendant is given credit for time served.
AFFIRMED AND REMANDED WITH INSTRUCTIONS.