700 So.2d 1005 (1997)
STATE of Louisiana
v.
Dennis Glenn BARNETT.
No. 96 KA 2050.
Court of Appeal of Louisiana, First Circuit.
September 23, 1997.
*1007 Bernard E. Boudreaux, Jr., District Attorney, Curtis Sigur, Asst. District Attorney, Franklin, for State.
Robert P. Fuhrer, Morgan City, for Dennis Glenn Barnett.
Before LeBLANC and FITZSIMMONS, JJ., and CHIASSON,[1] J. Pro Tem.
LeBLANC, Judge.
Defendant, Dennis Glenn Barnett, was charged by amended bill of information with attempted second degree murder and unauthorized entry of an inhabited dwelling, violations of La.R.S. 14:27 & 14:30.1 and 14:62.3. Defendant entered pleas of not guilty and not guilty by reason of insanity. Defendant waived his right to a jury trial; and, after a bench trial, he was found guilty as charged on both counts. For the attempted second degree murder conviction, defendant was sentenced to imprisonment at hard labor for twenty-five years without benefit of probation, parole or suspension of sentence and ordered to make restitution to the victim in the amount of $4,079.19. For the unauthorized entry of an inhabited dwelling conviction, defendant was sentenced to imprisonment at hard labor for three years and ordered to make restitution to the victims in the amount of $1,298.63. The court further ordered that the sentences run consecutively and that defendant receive credit for time served. Defendant has appealed. The record in this appeal contains no assignments of error.[2] Defense counsel urges two assignments of error in brief.
The instant offenses occurred at about 2:00 a.m. on September 3, 1995, at the home of Kevin Simon and his wife, Kaci Simon,[3] in Patterson, Louisiana. The victim of the attempted second degree murder was Carol Barnett to whom defendant was married at the time of the offense. The Barnetts, who also lived in Patterson, resided a few blocks from the Simons.
On the evening of September 1, 1995, the Barnetts and the Simons went to Tampico's Restaurant in Morgan City, Louisiana. While the couples were there, the subject of marital infidelity came up, and defendant made the statement that, "if he ever caught Carol messing around that he would skin her alive."
*1008 During the afternoon of the following day, September 2, defendant went to the Simons' home to assist Kevin with some work at a camp. Later, at about 7:00 p.m., the Simons and the Barnetts went back to Tampico's to attend a surprise birthday party for a mutual friend, Tony Allemand.
During the evening at about 9:00-9:30 p.m., Kevin Simon took defendant home. However, defendant returned to Tampico's shortly thereafter. Defendant walked up to Carol, told her he had wrecked her 1990 Chevrolet Lumina, slapped her face and exited Tampico's. The Lumina was parked in a nearby parking lot; and there were police outside looking for the driver of the Lumina, since the car had been involved in a hit and run accident.
Carol, Kaci and Lea Verret left Tampico's at about 10:00-10:30 p.m. and rode to the Simons' home in Kaci's truck where they joined Kevin, who had driven the Barnetts' truck back to Patterson at Carol's request. From the Simons' home, the Simons, Carol and Lea Verret went to the Red Cypress Lounge in Patterson, arriving there at about 11:00 p.m.
At about 2:00 a.m., Kevin left the lounge with a friend; and Kaci, Carol and Lea Verret left the lounge in Kaci's truck and went to the Simons' home, about a block away. When Kaci, Carol and Lea arrived at the Simons' home, Kaci assumed Kevin was already home as the gate to the fence was open. The three went inside Kaci's home. Kaci became aware that Kevin was not home but that someone had been there. The three of them apparently had assumed that defendant had been arrested in connection with the hit and run accident.
After Kaci found two messages from defendant on her telephone answering machine, which she described as "real funny sounding," she became frightened and called emergency 911. While making the call, Kaci heard a knock at the door. Defendant identified himself, forcibly kicked in the door and entered the residence. Lea had hidden inside a closet. Carol and Kaci were in the bedroom. Defendant "ripped" the phone from the wall, and began beating Carol's head against the headboard of Kaci's bed. Kaci got into the closet with Lea as the beating continued. Kaci and Lea could hear defendant repeatedly saying he was going to kill Carol.
Lea and Kaci were still in the closet when the police came to the residence, entered and ordered defendant to lie on the bed. Defendant complied and was taken into police custody.

ASSIGNMENT OF ERROR NO. ONE:
In this assignment, defendant contends that the evidence was insufficient to sustain his conviction of attempted second degree murder.[4] More specifically, defendant argues that the state failed to prove the requisite specific intent for the offense, because his intoxication at the time of the incident precluded the formation of that intent.
In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). See also La.Code Crim.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La.1988).
When circumstantial evidence is used to prove the commission of the offense, La.R.S. 15:438 mandates that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This statutory test is not a purely separate one from the Jackson constitutional sufficiency standard. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden. *1009 State v. Rosiere, 488 So.2d 965, 968 (La.1986).
The gravamen of the crime of attempted second degree murder is the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal. La.R.S. 14:27 and 30.1. See State v. Jarman, 445 So.2d 1184, 1189 (La.1984); State v. McCue, 484 So.2d 889, 892 (La.App. 1st Cir.1986).
Kaci Simon testified that on September 2, at Tampico's defendant "had a large Margarita;" and she saw him "take a shot" of whiskey. When Kevin left Tampico's to take defendant home, defendant was swaying and staggering. Kaci also stated that she thought his speech was slurred.
Kaci testified that, when defendant broke into her house and entered her bedroom, Carol was under the bed. Defendant flipped the mattress on the bed. She and Carol "scooted up" from beneath the bed where they had sought refuge. Defendant grabbed Carol by the back of the head and began banging her head on the headboard of the bed. Defendant was telling Carol he was going to kill her. Kaci was unable to quantify the number of times defendant made that threat or the number of times he hit Carol's head against the headboard. Kaci stated that, after she got into the closet she exited it one time momentarily before getting back into the closet and saw defendant was beating Carol's head on the door frame. While Kaci was in the closet, Carol was screaming for Kaci to help her, and defendant was asking Kaci where she was and telling her to come out. Kaci further testified that she could hear "thugs and hits" before the police came.
Lea Verret testified that she did not remember what defendant had to drink on September 2 at Tampico's. However, she stated that she did see defendant with a Margarita in front of him. Lea stated that, when defendant knocked down the door at Kaci's house, she climbed in the closet. Although Lea could not see what was happening outside the closet, she could hear struggling, Carol screaming and defendant repeatedly saying: "I'll kill you, bitch." The struggle continued with Carol screaming for help and pleading for defendant to stop.
Carol Barnett testified that defendant was serious when he made the threat on September 1 at Tampico's to "skin [her] alive" if he caught her cheating. However, defendant never accused her of having an affair.
Carol stated that, when she and defendant went to Tampico's on September 2, they rode in their truck and left the Lumina at home. At that time, the car was not damaged in any way. All Carol could remember defendant drinking at the birthday party at Tampico's that day were two Margaritas. Carol testified that she saw the Lumina when she left Tampico's on the night of September 2 and that the police said they were waiting for defendant to come out and were going to arrest him.
Carol testified that she learned defendant had not been arrested when defendant broke into Kaci's home. She stated that at that time defendant grabbed her by the hair on her head and by her arm and started beating her. Carol remembered defendant telling her: "I'm going to kill you, Bitch." Carol stated that defendant hit her head against the headboard of the bed and hit her with his fists. She thought he was going to kill her and recalled "taking a lot of licks to the head." Although she was trying to get away from defendant, she tried to remain in the house when defendant attempted to pull her out through the front door, because she was afraid that if he took her outside "it was all going to be over and done with." At that point, defendant grabbed her dress and went out the door with the dress in his hand. Carol ran and got underneath the bed. Defendant reached down, grabbed Carol and started beating her again "really hard." According to Carol, two times during the beating she "went blank[,]" i.e., was knocked out. She stated that she bled "[v]ery badly" and was hurting "[v]ery much" from the beating.
Carol testified that defendant had previously beaten her on April 29, 1990, while she and defendant were in Trenton, Tennessee. While she and defendant were riding horses together, a "young kid" hollered at Carol. She waved to the kid. When she and defendant *1010 got back home and got off the horses, defendant started complaining and kicked her "in [her] tail." When defendant was going up the steps to the house, Carol came from his rear and struck him with a horse bridle she had in her hand. Defendant turned around, hit her in her eye with his fist, choked her and began to hit her head against a concrete block. She received medical attention for her injuries at a hospital emergency room. Criminal charges were filed against defendant to which he pled guilty.[5]
Kevin Simon testified that, on the afternoon of September 2, he, defendant and two other men drank three or four six packs of beer between them. Defendant left to attend the birthday party at Tampico's. Shortly thereafter, Kevin joined defendant at the party. Everyone was drinking and eating. Kevin stated that he saw defendant drink two large Margaritas and that he thought defendant and Tony Allemand had one or two shots of whiskey. Kevin testified that defendant "probably had a little `buzz'" and that he took defendant home because defendant was aggravating his friend's mother. While at the Barnetts' home, Kevin saw the Barnetts' car; and there was no damage to the car. After leaving defendant's home, Kevin saw the Barnetts' car leaving their house. After returning to Tampico's, Kevin again saw the car with policemen around it.
Police officers who responded to the 911 call and participated in defendant's arrest included Louisiana State Trooper Michael Arton, Patterson Reserve Officer Trent Duplantis and St. Mary Parish Sheriff's Deputy Charles Bear Bryant, Jr. When Trooper Arton went to the Simons' home, he hit his flashlight on the outside of the home and announced the presence of the police. When Arton and other officers went inside, Arton saw a female on her hands and knees. Arton testified that her face and whole upper body were covered with blood. Arton stated that from what he saw defendant had apparently been hitting the woman's head against the bed. There were pools of blood in the wicker on the bedpost of the bed and blood "all over" the room. Defendant, who was sitting on the bed, did not appear to be intoxicated. His speech was very clear and normal, and Arton did not remember smelling any alcohol.
Duplantis testified that, when he entered the Simons' home, the woman was on her hands and knees crawling out of the room screaming for help. Duplantis stated that he did not smell any alcohol and that he was not with defendant long enough to be able to "identify" if defendant was intoxicated.
Bryant testified that he transported defendant from the crime scene to the Berwick Police Department and read defendant his Miranda rights. Defendant made the statement that he had no knowledge of how blood got on his hand; and, when Bryant asked defendant if he knew what had taken place that night, defendant responded that he did not know or did not remember what had occurred.
Morgan City Police Officer Janis Merritt testified that she investigated the hit and run accident on the U.S. 90 bridge in Morgan City in which the Barnetts' Chevrolet Lumina was involved and lost one of its front tires. She followed the marks in the highway made by the Lumina when the car was driven from the accident scene with only a rim on the wheel that lost the tire. Merritt found the car in a parking lot near Tampico's.
Dr. Lianter Albert, an expert internist, testified that he examined and treated Carol Barnett at the hospital. He saw her a few hours after she was admitted on September 3. Dr. Albert stated that Carol had a laceration on the right forehead, hematoma on the left side and was tender on the right side of her face, with a large hematoma of the left frontal face, echomosis of her left eye, "a small, small one" on the right side of her eye, a laceration of about ½ centimeter at the right forehead, a laceration of about ½ to 1 centimeter on top of the upper lip, blood in the mouth and upper palate, numerous points of contusions on the face, abrasions on the right shoulder and tenderness and small abrasions to the "[h]and, wrist and her *1011 knees." His diagnosis was that Carol had a closed-head injury and was intoxicated. Dr. Albert stated that she was placed in the intensive care unit, because it was felt that her condition was life-threatening and critical. However, Dr. Albert stated that Carol "recovered very well" and that it appeared she was more intoxicated than he had thought and not as critical. He further stated that, objectively, he could not support his subjective findings that her injuries were life-threatening.
Beverly Barbin, who lived next door to the Barnetts, testified that on September 2, 1995, she baby-sat two children for the Simons and two for the Barnetts. Carol Barnett brought her children to Barbin at about 6:30 p.m.; defendant picked them up the following morning at 12:30 a.m. According to Barbin, defendant was walking "kind of slowly," "kind of sweaty a little" and his speech was "[k]ind of slower," when he came to get the children. Barbin stated that defendant did not appear to be upset, was friendly, smiled and spoke in a pleasant voice. Barbin allowed defendant to take the children, because the Barnetts lived next door, and she thought Carol was home; otherwise, according to Barbin, she would not have, because she felt defendant was intoxicated, and did not feel the children would have been safe alone with him.
Defendant took the witness stand in his own defense at trial. He acknowledged his guilty plea to the assault and battery of Carol Barnett in connection with the 1990 incident in Tennessee. However, in regard to that incident, he denied that he had choked her or hit her head against concrete. He stated that he kicked Carol and that, after she hit him in the head with the two horse bridles she was carrying, he "snapped" and slapped her, knocking her to the ground. Defendant further stated that he did not know if she hit anything when she fell on the ground.
Defendant also acknowledged he had made statements that, if he ever caught Carol "messing around," he would "skin her alive." However, defendant maintained that these statements were made in a joking, rather than a serious, manner.
Defendant testified that, other than the two incidents involving Carol, the only time he ever struck anyone was in a fight with another male when he was sixteen years old. The male had pushed defendant's girlfriend down a flight of stairs, which upset defendant "real bad."
Defendant testified he was currently taking prescription medication. He had prescriptions for Paxil and Buspar. Defendant stated that he took the Buspar only when he was out of the Paxil.
Defendant testified that on September 2, 1995, he went to Kevin Simon's home at about 1:00-3:00 p.m. and remained there until about 6:00-6:30 p.m. While at Kevin's home, defendant was drinking beer. Defendant had bought a case of beer which was empty when he left, and Kevin and two other men who were there also had provided some beer for them to drink. While at home getting ready to go to the birthday party at Tampico's, defendant took a dose of Buspar. He ran out of Paxil on the preceding day and had not taken Buspar since March of 1995 when he left Tennessee and came to Louisiana.
Defendant recalled going to the birthday party at Tampico's and having had a Margarita and a shot of whisky while there. According to defendant, he did not remember anything that happened from the time he had the shot of whisky until the police told him to lie down on the bed at the Simons' home.
Tammy Lucas, who was married to defendant prior to his marriage to Carol Barnett, testified that, with the exception of the incidents involving defendant and Carol and a fight defendant once had at school, she had no knowledge of him acting in a violent way toward anyone. Laura Blanchard, a sister-in-law of defendant testified that, other than the incidents involving defendant and Carol, she had never heard of and had no knowledge of any other incidents of defendant fighting with or striking anyone. Similarly, Anna Marlene "Roxie" Barnett, another sister-in-law of defendant, testified that, with the exception of the incidents between defendant and Carol, she had never heard of and *1012 had no knowledge of defendant being violent toward anyone.
Kathy Thornton, a nurse at the St. Mary Parish Sheriff's Office, testified that she verifies and obtains medications for prisoners. She checked and determined defendant had valid prescriptions for Paxil and Buspar. She stated that, since defendant's incarceration for the instant offenses, defendant had been taking the Paxil but not Buspar.
F.T. Friedberg, an expert in forensic neuropsychology, testified that he examined defendant at the St. Mary Parish Jail on November 15, 1995. He stated that he thinks defendant has a very serious alcohol problem and, diagnostically, defendant appears to be a chronic alcoholic.
Friedberg testified that he is familiar with Paxil and Buspar. Buspar is an anti-anxiety medication similar to Valium, but it is not addictive. Alcohol and Buspar are sedative drugs, and combining the two produces enhanced effects. However, Buspar is supposed to make a person mellow; and defendant's use of alcohol with Buspar could have made him more mellow.
According to Friedberg, it was "quite unlikely" that defendant could have formed a specific intent to kill if he had ingested four to six beers over a four hour period, followed by a dose of Buspar, a medium or large Margarita and a shot of whisky. Assuming those were the facts, Friedberg did not think defendant would have been in a condition to make a "clear judgment" about wanting to kill.
Friedberg testified he did not know for certain if defendant had had a blackout during the period for which defendant said he had no recall. Friedberg attributed any blackout as described by defendant as attributable to alcohol consumption. He stated that ingestion of Buspar was an additional factor but one not necessary for such a blackout to occur.
Friedberg further testified that nearly all studies have shown that "alcohol in its extremes" has been associated with eighty percent of violent crimes and eighty percent of suicides, because alcohol affects the cortex of the brain, which is involved primarily in inhibiting responses.
During his testimony, Dr. Lianter Albert testified he was familiar with Buspar, which he described as a very mild sedative used for treatment of anxiety. Based on studies he had consulted, there is not much interaction of Buspar and alcohol. Buspar has a synergistic effect when combined with alcohol; and, depending on the particular individual involved, taking the two together could accentuate the effects of the alcohol or the Buspar. However, he indicated that he did not think taking the two together would cause a person to "go into a rage."
In this case, the trial court as trier of fact rejected the defense that defendant was so drugged and/or intoxicated that he could not form the specific intent to kill required for attempted second degree murder. The court was the ultimate fact finder of whether or not defendant proved his condition and whether or not the state negated the defense of voluntary intoxication beyond a reasonable doubt. As a reviewing court, we do not impinge on the fact-finding prerogative of the trier of fact in a criminal case except to the extent necessary to guarantee constitutional due process. See State v. Davis, 92-1623, pp. 10-11 (La. 5/23/94); 637 So.2d 1012, 1020, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994).
Viewing all the evidence in the light most favorable to the state, any rational trier of fact could have concluded beyond a reasonable doubt and to the exclusion of any reasonable hypothesis of innocence that defendant was guilty of attempted second degree murder.
This assignment lacks merit.

ASSIGNMENT OF ERROR NO. TWO:
In this assignment, defendant contends that the trial court erred by imposing unconstitutionally excessive sentences. Defendant asserts that the court failed to particularize the sentences to defendant and failed to consider the mitigating factors in La.C.Cr.P. art. 894.1.
The Code of Criminal Procedure sets forth items which must be considered by *1013 the trial court before imposing sentence. La. C.Cr.P. art. 894.1. The trial court need not recite the entire checklist of Article 894.1, but the record must reflect that it adequately considered the guidelines. State v. Herrin, 562 So.2d 1, 11 (La.App. 1st Cir.), writ denied, 565 So.2d 942 (1990). In light of the criteria expressed by Article 894.1, a review for individual excessiveness should consider the circumstances of the crime and the trial court's stated reasons and factual basis for its sentencing decision. State v. Watkins, 532 So.2d 1182, 1186 (La.App. 1st Cir.1988).
Although a sentence falls within statutory limits, it may be excessive. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). However, the trial court has great discretion in imposing a sentence within the statutory limits; and such a sentence will not be set aside as excessive in the absence of manifest abuse of discretion. State v. Latiolais, 563 So.2d 469, 473 (La.App. 1st Cir.1990).
La.C.Cr.P. art. 883 provides, in pertinent part:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. (emphasis added).
This article specifically excludes from its scope sentences the court expressly directs are to be served consecutively. State v. Littleton, 436 So.2d 500, 506 (La.1983). Although the imposition of consecutive sentences requires particular justification when the crimes arise from a single course of conduct, consecutive sentences are not necessarily excessive. Other factors must be taken into consideration in making this determination. See State v. Freeman, 577 So.2d 216, 219 (La.App. 1st Cir.), writ denied, 580 So.2d 668 (1991). Consecutive sentences are justified when the offender poses an unusual risk to public safety. State v. Hunter, 628 So.2d 57, 63 (La.App. 1st Cir.1993), writ denied, 93-2837 (La. 2/11/94); 634 So.2d 372.
Defendant's penalty exposure for the attempted second degree murder was imprisonment at hard labor without benefit of probation, parole or suspension of sentence for a maximum of fifty years; and he faced a maximum of six years at hard labor for the unauthorized entry of an inhabited dwelling. See La.R.S. 14:27(D)(1), 14:30.1(B) & 14:62.3(B). Herein, defendant received consecutive sentences of twenty-five years at hard labor without benefit of probation, parole or suspension of sentence and three years at hard labor.
Defendant was sentenced at a May 31, 1996, sentencing hearing. Thereafter, defendant timely filed a motion to reconsider his sentences, which the court denied.
At the sentencing hearing defendant presented his own testimony and that of several other witnesses on his behalf. Additionally, the trial court received various correspondence and letters from family and friends of defendant that were supportive of defendant.
In its initial sentencing remarks, the trial court stated that it had read and carefully considered the correspondence and letters from defendant's family and friends in determining the sentences for the instant crimes. The court also indicated that it had listened carefully to the testimony presented at the hearing. The court stated that it believed defendant's family and children need him as every family needs a father. The court also made specific reference to the circumstances of the crimes and stated that defendant must assume responsibility for his actions. The court took cognizance of the prior assault and battery defendant committed against Carol Barnett while she and defendant were in Tennessee and the extreme violence of the instant offense of attempted second degree murder. The court opined that, if the police had not intervened in response to the 911 call, defendant probably would have beaten the victim to death. The court also noted the effects of the instant crimes on the other two victims, Lea Verret and Kaci Simon.
In additional sentencing reasons, the trial court opined that defendant continues to be a danger to society. The court stated that there was an undue risk that, during a period of any suspended sentence or probation, defendant would commit another crime. The *1014 court found that defendant was in need of correctional treatment or a custodial environment most effectively provided by the commitment of defendant to an institution. The court noted that any lesser sentences would deprecate the seriousness of the crimes involved. In imposing the sentences, the court noted other factors, which included statements by the court that the offenses had resulted in significant permanent injury or economic loss to Carol Barnett and that defendant had reasonably foreseen the endangerment of human life, considering the manner in which defendant conducted himself during the commission of these offenses.
We find no error in the court's determination that these sentences at the middle range provided by statute were appropriate for this defendant and these offenses. Nor do we find the sentences excessive because the court ordered them served consecutively. The sentencing record supports their imposition. Furthermore, as previously mentioned, the trial court considered testimony given by defendant and several other defense witnesses and letters and correspondence submitted on defendant's behalf; and, in light of the court's consideration of that testimony and those documents and the reasons expressed by the court, we have no difficulty concluding that the court adequately considered relevant sentencing factors including those in mitigation. Accordingly, this assignment is meritless.

PATENT ERRORS
However, we do note as patent sentencing errors that the trial court ordered defendant to make restitution to the victim as part of the sentence for each of the instant offenses. Generally, the ordering of restitution to a victim is not authorized unless the imposition or execution of sentence is suspended. See La.C.Cr.P. arts. 895 and 895.1; State v. Matthews, 572 So.2d 250, 254 (La.App. 1st Cir.1990), writ denied, 575 So.2d 387 (1991); State v. Jones, 94-383, p. 8 (La. App. 5th Cir. 10/25/94); 645 So.2d 773, 777, writ denied, 94-2826 (La. 3/10/95), 650 So.2d 1175. Compare La.R.S. 14:78.1(E)(3) (authorizing a sentencing court to provide payment to an aggravated incest victim in an amount "up to but not in excess of the pecuniary loss caused by the offense"). Because neither of the instant sentences were suspended, we must amend these sentences by vacating the orders that defendant make restitution in the amounts of $4,079.19 and $1,298.63.
In addition, we note on September 7, 1995, the defense filed a motion for the appointment of a sanity commission to examine the competency of defendant to proceed. The court minutes of October 18, 1995, reflect that, on motion of defense counsel, a hearing on the motion for appointment of a commission was continued without date. Because the record did not reveal any further action by the trial court on the motion for appointment of a commission, this Court issued an order on March 10, 1997, to the clerk of the district court to provide us with documentation of any ruling on defendant's capacity to proceed and to notify us in writing if no such ruling occurred. On March 19, 1997, the district court clerk notified us by letter that a review of the record showed that no doctors were appointed to examine defendant and that the hearing on the motion for appointment of a commission set for October 18, 1995, was continued without date.
La.C.Cr.P. art. 642 provides as follows:
The defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed.
However, we find no transgression of the provisions of the above article in the situation present herein, which we find analogous to the situation found in State v. Gowan, 96-0488 (La. 3/29/96); 670 So.2d 1222. In Gowan, in granting the state's application for writs, the Louisiana Supreme Court stated the following:
Granted. The present case is distinguishable from State v. Nomey, 613 So.2d 157 (La.1993), since the trial judge never ruled on defendant's motion for appointment of a sanity commission. Unlike *1015 Nomey, there was no threshold determination by the trial judge that a sanity commission should be appointed. Therefore, by failing to request a hearing on this motion prior to entering his guilty plea, defendant implicitly waived his right to have the motion heard. Accordingly, the judgment of the court of appeal is vacated and set aside and the judgment of the trial court denying post conviction relief is reinstated.
Consequently, applying the same reasoning as the Louisiana Supreme Court used in Gowan, we find that defendant implicitly waived his right to have the motion to appoint a sanity commission heard. See and compare State v. Dugas, 96-49, pp. 3-4 (La. App. 3d Cir. 10/9/96); 683 So.2d 1253, 1255-1256, writ denied, 96-2652 (La. 4/4/97); 692 So.2d 417.
Finally, in reviewing the record for patent error, we find that joinder of the two charges in one bill of information was improper. Two or more offenses may be joined in the same bill of information, provided the offenses are "triable by the same mode of trial." La.C.Cr.P. art. 493. Unauthorized entry of an inhabited dwelling is triable by a jury of only six and, thus, cannot be joined with attempted second degree murder which is triable by a jury of twelve. See La. Const. Art. I, § 17; La.C.Cr.P. art. 782(A); La.R.S. 14:62.3(B), 14:27(D)(1) & 30.1(B). An objection of misjoinder of offenses may be urged only by a motion to quash the indictment. La.C.Cr.P. art. 495.
On January 24, 1996, defendant filed a motion to quash the original bill of information on the sole ground that the original charges of attempted second degree murder and aggravated burglary constituted double jeopardy. On January 31, 1996, the day trial began, the state filed the amended bill of information which substituted the unauthorized entry of an inhabited dwelling charge for the aggravated burglary charge. Without making a written amendment to the motion to quash or filing another such motion on grounds of misjoinder of the offenses, defense counsel orally objected to the amended bill on grounds of misjoinder at the beginning of the trial before the state began presenting its case-in-chief. The trial court apparently considered the objection as properly urged by a motion to quash, and in denying the motion the court ruled the joinder was proper. In reaching this conclusion, the court concluded the offenses were properly joined because the offenses were triable by the same mode of trial, i.e., a bench trial, as a result of defendant's waiver of the right to jury trial.[6] We disagree. The requirement of La.Code Crim.P. art. 493 that the offenses be triable by the same mode of trial clearly refers to the mode of trial as determined under the provisions of La.Code Crim.P. art. 782(A) and La. Const. Art. I, § 17. Thus, defendant's jury trial waiver did not make these offenses triable by the same mode of trial for purposes of the requirement.
Having found misjoinder, we must now determine if the misjoinder which occurred in this case was harmless error or whether it prejudiced the defendant's substantial rights. State v. Strickland, 94-0025, p. 14 (La. 11/1/96); 683 So.2d 218, 226. The record indicates defendant was tried by a judge rather than a jury. The state did not introduce any evidence on one of the charges that would not have been admissible at trial on the other charge alone, as the conduct constituting each offense was part of one continuous transaction, i.e., part of the res gestae. See La.C.E. art. 404(B)(1). Additionally, defendant was not precluded from presenting any type of defense by the joinder of the charges. Accordingly, we find that notwithstanding the misjoinder of the instant offenses, the error was harmless under these circumstances.
CONVICTIONS AFFIRMED; SENTENCES AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] Judge Remy Chiasson serving by appointment of the Louisiana Supreme Court.
[2] Although defendant did not properly designate any trial court ruling as a formal assignment of error as required by La.C.Cr.P. arts. 844, 916(1) and (5), and 920, in effect at the time of the appeal, this Court is bound to review the errors assigned and argued in his brief in accordance with the Louisiana Supreme Court's ruling in State v. Galliano, 94-2030, 94-2280 (La. 1/6/95); 648 So.2d 911. See State v. Galliano, 93-1101, p. 2, n. 1 (La.App. 1st Cir. 5/5/95); 655 So.2d 538, 540 n. 1. Furthermore, La.C.Cr.P. arts 844 A and 916(5) have been amended. See 1997 La. Acts No. 642, § 1.
[3] In the trial transcript, Mrs. Simon's first name is sometimes spelled "Cassy" or "Casey." We have chosen to use the spelling "Kaci" which was used in the signature on Mrs. Simon's victim impact statement which was introduced into evidence by the state at the sentencing hearing.
[4] Defendant does not challenge the sufficiency of the evidence of his conviction for unauthorized entry of an inhabited dwelling. Additionally, in his brief, he concedes that (although he entered dual pleas of not guilty and not guilty by reason of insanity) he did not present any evidence at trial of a mental disease or defect, which would have rendered him incapable of distinguishing between right and wrong at the time of the offenses.
[5] The state introduced into evidence a copy of the court proceedings from Tennessee, which reveals that defendant pled guilty to assault and battery in connection with the 1990 incident.
[6] The record establishes that on January 31, 1996, after the amended bill of information was filed, defendant waived the right to trial by jury.