STATE OF LOUISIANA
v.
KENNETH L. MIMS
No. KA 08-1420.
Court of Appeals of Louisiana, Third Circuit.
June 3, 2009
Not designated for Publication
JAMES C. DOWNS District Attorney-9th Judicial District MONIQUE Y. METOYER, Assistant District Attorney, Alexandria, Counsel for Plaintiff Appellee. State of Louisiana.
MARY CONSTANCE HANES Louisiana Appellate Project New Orleans, LA, Counsel for Defendant Appellant. KENNETH L. MIMS,
MONIQUE YVETTE METOYER, Attorney at Law Alexandria, LA, Counsel for Plaintiff Appellee. State of Louisiana.
Court composed of THIBODEAUX, Chief Judge, SAUNDERS, and PETERS, Judges.
SAUNDERS, JUDGE.
Defendant, Kenneth L. Mims, was originally charged with first degree murder. On August 18, 2004, the State amended the indictment to charge Defendant with one count of second degree murder, in violation of La.R.S. 14:30.1.
The defense filed a "Motion and Order for Appointment of a Sanity Commission" in October 2004. The motion alleged that Defendant had demonstrated symptoms of mental illness that could prevent him from understanding the trial proceedings. The motion further asserted a psychologist had examined Defendant and had found him to be mentally retarded. The motion finally contended that Defendant may be unable to assist in his defense. The trial court granted a sanity commission, and, on May 31, 2005, the trial court conducted a sanity hearing and determined Defendant was capable of proceeding to trial.
Voir dire commenced on January 10, 2006. After jury selection, the State objected to the defense's use of peremptory challenges to remove all women from the jury. After listening to arguments by the State and the defense's rebuttal, which included a statement of gender-neutral reasons for the challenges, the trial court granted the State's objections as to Doris Gibbs and Christine Luczak.
Defendant's jury trial began on January 11, 2006, and lasted through the following day. The trial concluded with the jury unanimously finding Defendant to be guilty of second degree murder. As a result, on January 20, 2006, the sentencing court ordered Defendant to serve the mandatory penalty, life imprisonment without benefit of probation, parole, or suspension of sentence.
Defendant now appeals, arguing that there is insufficient evidence to support his conviction, that he was unable to assist in his defense due to mental defect, and that his reasons for challenging Ms. Gibbs and Ms. Luczak should have been sufficient. We affirm Defendant's conviction and sentence.

STATEMENT OF FACTS:
Marlo Davis, with the Rapides Parish Office of Community Services (OCS) was the first witness to testify on January 11, 2006, the first day of trial. As part of her duties and in response to a call around 4:00 p.m., Ms. Davis went to the Huey P. Long Medical Center on June 26, 2002. At the hospital, Ms. Davis met with a social worker who informed her of the two-year-old victim, Christopher Griffin's, diagnosis and prognosis.[1] Ms. Davis then called the Pineville Police Department (PPD) to report the child's injuries, and then spoke to Judge Johnson for an instanter order placing both Christopher and his brother in the State's custody.
Ms. Davis stated that she interviewed Christi Griffin, Christopher's mother, and spoke with Officer Alvarado and Lieutenant Doug Washington from the PPD when they arrived at the hospital. Ms. Davis observed Christopher before the doctors rushed him to x-ray. She stated that he was limp, and that his face was red.
Officer Billie Alvarado testified as the State's second witness. He stated that he went to the Huey P. Long Medical center on June 26, 2002, in response to a child abuse complaint, arriving around 4:53 p.m. Officer Alvarado spoke to Ms. Davis and observed the child being worked on by doctors and nurses.
Officer Alvarado stated that Christopher was lying on his back with his head turned to the left and blood coming out of his mouth, with the child's head swollen, and the area around child's right eye black.
Lieutenant Doug Washington was the State's third witness. He testified that on June 26, 2002, Officer Alvarado called him to the Huey P. Long Medical Center. After he arrived at the hospital, Lieutenant Washington spoke with Officer Alvarado and Dr. Tenaglia. Lieutenant Washington then viewed and photographed Christopher.
Lieutenant Washington next spoke with Ms. Davis, asked Ms. Griffin to contact him at the PPD for a follow-up interview, and summoned Sergeant Fletcher to assist in locating Defendant, who had left the hospital prior to Lieutenant Washington's arrival. Once he and Sergeant Fletcher contacted Defendant, Lieutenant Washington requested Defendant contact him at the PPD. Lieutenant Washington also interviewed Defendant's mother, Nora Mims, and sister, Yasmine Batts.
Lieutenant Washington also testified that Ms. Mims, Ms. Batts, Defendant, Detective Joe Simon, and Detective Keith McLain all accompanied him to Defendant's residence so he could take photographs. In the bathroom, Lieutenant Washington found indentations in the sheetrock at a child's head-level above the child's potty. Lieutenant Washington next returned to the PPD, where he interviewed Defendant.
Lieutenant Washington's investigation continued into the next day. On June 27, 2002, Lieutenant Washington called the LSU Shreveport Medical Center, where Christopher had been sent the previous day, and spoke to Dr. Lynn Lloyd, who was the pediatric doctor in charge. After speaking with the doctor, Lieutenant Washington contacted the OCS police officer Jerry Cearly at the Alexandria Police Department (APD). Lieutenant Washington's investigation concluded for the day after the Rapides Parish Advocacy Center interviewed Christopher's four-year-old brother at the APD.
Lieutenant Washington testified that his investigation continued on June 28, 2002, when he again contacted the LSU Shreveport Medical center to follow up on Christopher's condition. The following morning, Lieutenant Washington and his supervisor, Detective Paul, met with Ms. Griffin at the PPD, and she informed them that Christopher died at 5:00 that morning.
Lieutenant Washington explained that he then conducted a second interview with Ms. Griffin and received permission for a second search. Following the search, Lieutenant Washington seized a white snake skin belt belonging to Defendant and continued his investigation by interviewing Todd Mims, Defendant's brother, and Jerry Williams, a friend of the family.
Lieutenant Washington conducted a second interview with Defendant on August 29, 2002. Lieutenant Washington related that, after Defendant waived his Miranda rights, Defendant related the following account of events:
Mr. Mims stated that anything possibly could have happened to the baby because he was flagged down by Jerry Williams, a friend of the family, and he was advised that the baby  the baby was giving the mother a hard time. He was  he became  he said he was upset about it, came home and immediately disciplined the child  the kids because they would not listen to the mother.
He stated that Jerry advised him that the babies were playing in the rain  the mother made the baby go out in the rain and kept them out there because they were getting on her nerves. He came home and he disciplined them according to his methods.
Lieutenant Washington explained that Defendant's method of discipline involved spanking the children with his belt and putting them in a corner. The children were four and two years of age.
Lieutenant Washington recalled that Defendant told him that there were no bruises on Christopher's face when Defendant took him into the bathroom to give the child a bath. Defendant also stated that he put Christopher in two or three inches of bath water before leaving him alone for three to five minutes, and that no one, except he and Christopher, went into the bathroom during that time.
Further, according to Lieutenant Washington, Defendant told him that Christopher was lying lifelessly on his back when he returned to the bathroom. Defendant additionally reported lifting Christopher and taking him to Ms. Griffin.
Finally, Lieutenant Washington testified that Defendant admitted to him that he and Ms. Griffin had been arguing over how Defendant disciplined the children. Lieutenant Washington reported Defendant was five feet eight inches tall, weighed between 135 and 145 pounds, and had a muscular build.
Defendant's statement given to Lieutenant Washington set forth Defendant's version of events. Defendant stated that he had been told that Ms. Griffin had put the children out on the steps, but when he arrived home the children were on the couch. Defendant spanked Christopher's older brother on the backside with a belt and put him in a corner. Because Christopher had vomited on himself, Defendant instructed Christopher to go into the bathroom; Christopher complied. Defendant followed Christopher into the bathroom after he argued with Ms. Griffin.
In his statement, Defendant revealed that he had also spanked Christopher on the backside with a belt once they were in the bathroom. After two or three blows, Defendant stopped hitting Christopher with the belt; instead, Defendant began using his open hand to strike Christopher on his buttocks and the back of his head. Defendant claimed that he used his hand because OCS had told him he would go to jail if he bruised the children. When Defendant hit Christopher's head, Christopher fell forward and hit his head on the side of the bathtub. Defendant asserted that Christopher was conscious and had stopped crying when Defendant put him in the bathtub. Defendant stated that he left Christopher in the bathtub and went to argue with Ms. Griffin, and that when Defendant returned to the bathroom minutes later, Christopher was unconscious.
Mr. Williams was the fifth witness to testify at trial.[2] On June 26, 2002, Defendant's aunt, Bridget Joseph, asked Mr. Williams to check on Defendant. In accordance with Ms. Joseph's request, Mr. Williams went to Defendant's home. Defendant was not present, but Ms. Griffin, Ms. Mims, and Defendant's sister, Candace, were there with Christopher and his brother. Mr. Williams' stated that his visit lasted twenty to thirty minutes, and throughout his visit, the two boys loudly whined and cried in the front room. Ms. Griffin became angry, hollered at the boys, and hit Christopher on the side of his head. According to Mr. Williams, the blow caused Christopher to move back a little, but he was still on his feet walking around. Mr. Williams stated he left when Ms. Griffin put the boys outside on the front steps and locked them outside in the rain.
Mr. Williams explained that, after he arrived home, he told Ms. Joseph what had happened during his visit. Later, Mr. Williams saw Defendant who, at the time, was on his way home from work. Mr. Williams told Defendant what had happened and stated Defendant needed to check on the children because they had been locked out in the rain.
Ms. Griffin testified as the State's sixth witness. At the time of trial, Ms. Griffin had two children, a boy age eight and a girl age two. Ms. Griffin began a relationship with Defendant in January 2002. In March 2002, Ms. Griffin and her sons voluntarily moved out of her mother's house and moved in with Defendant, Ms. Mims,, and Defendant's younger brother.
Ms. Griffin recalled waking around 10:00 a.m. on June 26, 2002. When she got up, Ms. Griffin's two sons, Ms. Mims, Ms. Batts, and Ms. Batt's children were all present in the house. Christopher and his older brother were watching television in the living room. Ms. Griffin sat with her sons and rocked Christopher to sleep because he was not acting like himself. According to Ms. Griffin Christopher whined and fussed, looked as if he were sick or sleepy, but was having trouble falling asleep. When Christopher awoke, he was jumping and crying. Ms. Griffin gave Christopher some water, but he vomited after drinking.
Ms. Griffin stated she changed Christopher's shirt and sat with him on the couch while he dozed in and out of sleep. Ms. Griffin testified that Mr. Williams had visited during the day, staying fifteen to twenty minutes. Ms. Griffin said that, during Mr. Williams's visit, the boys continued to watch television from the couch. Ms. Griffin stayed on the couch the rest of the day.
Ms. Griffin explained that, when Defendant arrived home from work that afternoon, he was in a rage. Defendant stripped off his shirt and went into the living room yelling, "I can't even leave this mother f___ing house without having to come back and hearing [sic] things, that y'all don't know how to behave." Ms. Griffin stated that Defendant grabbed her older son off the couch, spanked him, and put him in the corner, and then Defendant yanked Christopher, who had been sleeping, "off the couch by his arm and threw him in the corner." During her testimony, Ms. Griffin asserted the children had not been misbehaving that day.
Ms. Griffin testified Christopher bumped his head on the television, fell to his knees, and vomited when Defendant slung him into the corner. Ms. Griffin began yelling at Defendant, but he did not stop. She stated that he was out of control.
Ms. Griffin next stated that because Christopher vomited on his clothing, Defendant yelled for him to go into the bathroom to take a bath. From her bedroom, Ms. Griffin heard Defendant whipping Christopher, Christopher screaming, and water running into the bathtub. Ms. Griffin yelled at Defendant, who did not listen, so Ms. Griffin, deciding they both needed time to calm down, went outside and sat on the back steps. Ms. Griffin stated that she heard Defendant stop whipping Christopher, Christopher stop crying, and the bathroom door close. Next, she recalled that Defendant called out to her, saying that something was wrong with Christopher. Defendant carried Christopher out of the bathroom and told her Christopher had fallen while he was in the bathtub.
Ms. Griffin explained that she told Defendant to take him to the hospital. Ms. Griffin testified that she sat in the back with Christopher and talked to him while Defendant drove. Ms. Griffin stated that she yelled at Defendant and demanded to know what had happened, but Defendant did not give her a straight answer.
At the hospital, Ms. Griffin had Defendant take Christopher into the emergency room and followed behind. Ms. Griffin could not carry Christopher, as she was weak from multiple sclerosis. She stated that Christopher's right eye had already been bruised that morning, but he did not have any other bruising before he went into the bathroom.
Ms. Griffin denied ever spanking her children and said she never had any behavioral problems from them. Ms. Griffin confirmed she pled guilty to negligent homicide based on the circumstances of Christopher's death.
On January 12, 2006, the State called Dr. Elizabeth Tenaglia Azel to testify as the prosecution's seventh witness. The parties stipulated that Dr. Azel was an expert in emergency room medicine. Dr. Azel testified that she worked at Huey P. Long Medical Center on June 26, 2002, and as part of her duties, she treated Christopher Griffin. Dr. Azel stated that she was standing near the ambulance ramp when a man walked in carrying a child. She recalled that the man said the child had passed out while in the bathtub. Dr. Azel had no further contact with the man, who identified himself as the mother's boyfriend.
Dr. Azel reported that emergency personnel began immediate emergency treatment. The child had diminished consciousness, no verbal skill, extensive bruising over his forehead and around his eyes, and was posturing-extending his arms and legs in an extensive pattern, thus indicating brain injury. The emergency personnel gave him oxygen and eventually intubated him. The medical staff performed a CT scan, which revealed: that intracranial blood was located where it did not belong, that Christopher's brain had shifted over to one side because of the swelling, and that Christopher's brain was compressed against the skull.
Dr. Azel asserted that Christopher's bruising would not have been the result of a single blow to the head. Christopher's bruising was also inconsistent with a thirtytwo-inch tall individual falling in the bathtub. Further, Dr. Azel stated that the intracranial bleeding was also inconsistent with a fall in the bathtub. According to
Dr. Azel's experience, the injuries Christopher had would have been caused by significant and sometimes repetitive force.
Dr. Collie Trant, who qualified as an expert in forensic pathology with a specialty in cases involving children, testified as the State's final witness. Dr. Trant received and examined glass slides of tissue and blood samples taken from Christopher, a packet of photographs of Christopher (including autopsy pictures), and all of Christopher's medical records, including the autopsy report. Based on the records, Dr. Trant concluded Christopher died from "shaken baby impact shaking syndrome."
Dr. Trant explained shaken baby impact shaking syndrome meant that, in addition to Christopher being severely shaken in a manner causing his head to move back and forth, he was also hit on the head several times with a blunt object around or during that period of shaking. Because Christopher survived more than four hours after his bruises were inflicted, it usually would not be possible to determine when his bruises had been inflicted due to swelling; however, because the emergency room doctors put Christopher on steroids to reduce inflamation, Dr. Trant was able to determine that Christopher had sustained his injuries less than four hours before being placed on the steroids.
Dr. Trant related that Christopher had severe bruises on the back of his scalp; the underlying tissue had been pulped. Christopher also had a subdural hematoma over the right cerebral hemisphere of his brain, severe swelling of the brain, and a hemorrhage into his eyes when he was presented to the hospital. Dr. Trant opined that Christopher would not have been able to walk with these injuries. So, according to Dr. Trant, if Christopher had walked into the bathroom before losing consciousness, as had been stated by Defendant, he did not have the injuries when he entered the bathroom. Additionally, Dr. Trant stated that Christopher's injuries were not consistent with a fall in the bathtub.
Dr. Trant reported Christopher was two feet and eight inches tall. Because the bruises on Christopher's head overlapped and blended into one large bruise, Dr. Trant could not determine the number of individual blows that caused the trauma, however, Dr. Trant guessed it could have been twenty blows. Dr. Trant said a child Christopher's size could not have inflicted all or even most of the injuries on himself.
On cross-examination, Dr. Trant explained that the retinal hemorrhages had been caused by the shaking because the lack of damage to the fragile bones around the eye indicated the bleeding had not been caused by a blow. Although vomiting can be a symptom of brain swelling, according to Dr. Trant, Christopher's vomiting, irritability, and jumping during sleep earlier in the day would not have been an indication he was suffering from shaken baby syndrome. Finally, Dr. Trant testified that the swelling in Christopher's brain caused brain death, that Christopher's injuries would have incapacitated him within ten minutes, and that, individually, either the blunt force or the shaking could have caused the brain trauma, as a single blow could have been responsible for killing Christopher.
Defendant called his mother, Ms. Mims, as his first witness. Ms. Mims and her daughter, Ms. Batts, were living with Defendant and Ms. Griffin at the time of the incident. Ms. Mims stated that she never saw either Defendant or Ms. Griffin discipline the Griffin children, nor did she see Ms. Griffin discipline the children that day.
The second witness for the defense was Ms. Batts. Ms. Batts testified that she was present all day at the location of the incident, but she did not see anything. Ms. Batts recalled that Defendant came in from work, greeted everyone, and then went with the children into the back of the house, where Ms. Griffin was already located. Ms. Batts stated that she saw, on approximately ten occasions, Ms. Griffin discipline her children by whipping them with a belt when they did something wrong.
On cross-examination, Ms. Batts stated she had never seen Defendant spank the children. Rather, she stated that he disciplined them by putting them on their knees in the corner. Ms. Batts then testified that she overheard Defendant and Ms. Griffin arguing in the back of the house.
Ms. Joseph was the last defense witness. Ms. Joseph stated that Defendant and Ms. Griffin had lived with her for approximately two months. During that time, Ms. Joseph observed Defendant discipline the children by yelling at them and putting them in a corner, and, once, used a switch on their legs. Ms. Joseph said she saw Ms. Griffin discipline the children on at least three occasions with a cable cord from the VCR. Ms. Joseph said that she had evicted Ms. Griffin after they argued about the use of the cord. Ms. Joseph explained that, on the last occasion, Ms. Griffin beat the children so hard that Ms. Joseph's next door neighbor overheard and intervened. Ms. Joseph additionally asserted that she had seen Ms. Griffin strike the oldest boy with her fist. Ms. Joseph denied ever seeing Ms. Griffin strike Christopher with her fist.

ASSIGNMENT OF ERROR NO. 1:
Defendant argues there was insufficient evidence to support his conviction as, although he made a statement to police indicating that he accepted the blame for the death and admitted that he had struck the child, according to the medical testimony, the state did not prove that the injuries that he inflicted led to the victim's death. The State responds that, based on the evidence presented at trial, a rational trier of fact could have concluded the prosecution proved its case beyond a reasonable doubt.
In order to determine sufficiency of the evidence, the evidence is viewed in the light most favorable to the prosecution in order to determine whether a rational factfinder could have determined that the State proved the elements of the offense beyond a reasonable doubt:
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the Jackson standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.
State v. Macon, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted). "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438.
In 2002, the pertinent portion of the statute prohibiting second degree murder stated the following:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
....
(b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.
La.R.S. 14:30.1.
The trial court instructed the jury in both specific intent and cruelty to juveniles. In 2002, cruelty to juveniles included "the intentional . . . mistreatment . . ., by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." La.R.S. 14:93. "The term `intentional' within the meaning of this statute, requires general criminal intent to cause a child unjustifiable pain and suffering," and "mistreatment" means abuse. State v. Porter, 99-1722, p. 15 (La.App. 3 Cir. 5/3/00), 761 So.2d 115, 123.
When viewed in the light most favorable to the prosecution, the evidence presented at trial shows that, prior to Defendant's arrival home on the date of the incident, two-year-old Christopher exhibited symptoms of a stomach virus and had a black eye; otherwise, Christopher was ambulatory and able to speak. Once Defendant, who was in his twenties at the time of the incident, arrived home from work, no one but Defendant interacted with Christopher. Defendant, who was angry, grabbed Christopher by his arm and slung him into the corner; in doing so, Defendant caused Christopher to bump his head.
Defendant then had Christopher walk into the bathroom, so Defendant could bathe him. Once in the bathroom, Defendant not only spanked Christopher with a belt but also hit Christopher in the head with his hand. Christopher responded to the blows by screaming. Shortly thereafter, Christopher became unconscious and subsequently died from his injuries, which included severe bruising to the back of his head and bruising on his forehead.
The blows to the back of Christopher's head were so severe they pulped the tissue under the scalp. The repeated or severe blows also caused intracranial swelling that shifted and compressed Christopher's brain. The evidence further showed that, after the injuries had been inflicted, Christopher would not have been able to walk or talk. Christopher would have been unconscious within ten minutes of receiving his injuries.
Although Defendant claimed Christopher had hit the front or side of his head on the bathtub, the most severe injuries were to the back of Christopher's head, and those injuries were inconsistent with a fall. Additionally, according to the medical testimony, Christopher's being severely shaken within a short time of the blows contributed to his death.
In State v. Koon, 31,177 (La.App. 2 Cir. 2/24/99), 730 So.2d 503, our second circuit examined a second degree murder case wherein the defendant claimed the injuries to the child had been caused during a fall. The defendant told the victim's mother that the boy had fallen out of bed. Medical expert testimony at trial showed that the boy died from skull fractures before he reached the hospital, that the head injuries were caused by multiple blows by a blunt instrument to the head, and that the fatal injuries were inconsistent with a fall from bed because only a thirty to fifty foot fall could have crushed the child's head in a similar manner. Moreover, the victim showed evidence of prior abuse. Based on the evidence presented, the second circuit affirmed the defendant's second degree murder conviction.
In State v. Miller, 06-595 (La.App. 3 Cir. 9/27/06), 940 So.2d 864, writ denied, 06-2577 (La. 5/11/07), 955 So.2d 1278, this court examined another case involving shaken baby syndrome. In Miller, the four-year-old victim died from non-accidental brain trauma consistent with abuse by violent shaking. Like this case, the child had behaved normally during the days leading up to her death, and exhibited no symptoms until she was alone in her room with the defendant. Again like this case before us, the medical testimony indicated that the symptoms of the abuse were severe enough that they would have manifested immediately; thus, the child did not receive her injuries until after she had completed the activities reported shortly before her death. In Miller, this court found sufficient evidence to support the defendant's second degree murder conviction and further noted there had been evidence presented to show the victim had previously been physically abused.
Based on the evidence presented at trial, when viewed in the light most favorable to the prosecution, a rational trier of fact could have found Defendant killed Christopher either by intentionally inflicting great bodily harm or while perpetrating cruelty to a juvenile. Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2:
Defendant next urges he was not competent to assist in his defense, arguing that the trial court abused its discretion in determining that Mr. Mims, a mentally challenged man with an I.Q. of 60, was competent to stand trial for second degree murder in light of the strongly worded opinion of the psychiatrist who stated that Mr. Mims was not competent to proceed. Defendant further contends the trial court erred in accepting the opinion of the sanity commission psychologist because the opinion was conditioned on so many caveats that it was obvious Defendant was unable to assist in his defense.
The State argues that the record shows the information presented at the May 31, 2005, competency hearing supports the trial court's determination that Defendant was competent to assist in his defense. As such, the State contends that the trial court did not abuse its discretion.
Louisiana's law presumes sanity. State v. Ellis, 42,520 (La.App. 2 Cir. 9/26/07), 966 So.2d 139, writ denied, 07-2190 (La. 4/4/08), 978 So.2d 325.
The defendant bears the burden of proving his incapacity to stand trial. However, the burden is preponderance of the evidence and not proof beyond a reasonable doubt. In any event, the ultimate determination regarding competency is within the discretion of the trial court, and the reviewing court should not reverse that finding absent an abuse of that discretion.
State v. Cox, 07-774, p. 18 (La.App. 3 Cir. 1/30/08), 974 So.2d 891, 903, reversed on other grounds, 08-492 (La. 1/21/09), ___ So.2d ____.[3] (citations omitted). "Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." La.Code Crim.P. art. 641.
The twofold test of mental capacity to stand trial under this article is: (1) whether the accused fully understands the consequences of the proceedings; and, (2) whether he has the ability to assist in his defense by consultation with counsel. A defendant can be incompetent in this sense even though free of psychosis, oriented as to time and place and aware of his surroundings. Being mentally retarded or of subnormal intelligence is not in itself proof of incapacity. However, when substandard mental ability combines with other problems to prevent a defendant from rationally assisting his counsel, a fair trial cannot proceed.
Where there is conflicting medical testimony, a trial judge's determination of defendant's capacity to stand trial is entitled to great weight.
State v. Williams, 381 So.2d 439, 440 (La.1980) (citations omitted).
Appropriate considerations in determining whether the accused is fully aware of the nature of the proceedings include: whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. Facts to consider in determining an accused's ability to assist in his defense include: whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
State v. Bennett, 345 So.2d 1129, 1138 (La.1977).
Dr. Vijaya L. Boppana, certified in psychiatry, issued a sanity commission report on Defendant after interviewing him on January 24, 2005. Dr. Boppana wrote that Defendant understood his warnings that anything said to Dr. Boppana could be used against Defendant because Dr. Boppana was working for the court and not for Defendant. After evaluating Defendant, Dr. Boppana concluded that Defendant's score on the Georgia Court Competency Test, seventy, fell in the range indicating he was competent to stand trial. Defendant was aware of the seriousness of the charges against him, understood the consequences of the possible verdicts in the case, could manage his behavior at trial, and could tolerate the stress from the trial proceedings, but he did not understand legal proceedings at that time.
Psychologist Dr. John C. Simoneaux issued a more detailed report after he examined Defendant on February 14, 2005. Dr. Simoneaux reported Defendant had an I.Q. of sixty and speculated that Defendant was mildly mentally retarded. Although Defendant attempted to present additional mental illness, Dr. Simoneaux concluded Defendant was malingering and suffered no mental illness apart from retardation. Defendant was generally aware of the legal situation, but his understanding was very basic. Dr. Simoneaux determined Defendant would require "significant assistance from his attorney and from supportive family members in order to fully understand his current circumstance[s]." Dr. Simoneaux found Defendant's score of thirty-four on the Georgia Court Competency Test, when compared with his previous score of sixty-eight and his level of cognitive functioning, confirmed Defendant was malingering.
Dr. Simoneaux opined it was arguable whether Defendant's mental retardation would significantly impact his awareness of his legal situation and his ability to assist in his defense. Defendant understood and appreciated the nature and the seriousness of the charges, as this was evidenced by Defendant's malingering in an attempt to avoid incarceration. Though Defendant only had a basic understanding of the defenses available to him, he clearly understood the distinction between a guilty and a not guilty plea as well as the consequences of both pleas. Defendant did not completely understand his legal rights, but he would be able to understand them if they were carefully and simply explained. Defendant also clearly understood the possible verdicts and the consequences of conviction.
Dr. Simoneaux believed Defendant was capable of recalling and relating facts concerning his actions and whereabouts, but he may be unwilling to cooperate. Defendant would also be able to assist counsel in locating and examining relevant witnesses, to maintain a consistent defense if properly motivated, and to make simple decisions in response to well-explained alternatives. Defendant's mental retardation would compromise his perceptions of witness testimony and cause him some difficulty in informing his attorney about distortions or misstatements made by the witnesses. If Defendant testified on his own behalf, it would be necessary to make sure Defendant understood each question before he answered. Defendant's mental condition would not deteriorate as a result of trial stress. Based on the stated findings and caveats, Dr. Simoneaux concluded Defendant would be able to assist in his defense.
At the May 31, 2005, sanity commission hearing, the trial court considered the reports submitted by both Dr. Boppana and Dr. Simoneaux. The court found Defendant to be "competent, specifically since Dr. Simoneaux says he would be able to assist counsel in locating and examining any relevant witnesses, and he should be able to maintain a consistent defense if properly . . . motivated."
Based on the findings of both Dr. Boppana and Dr. Simoneaux, we find that the trial court did not abuse its discretion in determining Defendant was competent to proceed to trial, which was held seven months after the sanity hearing. Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 3:
Finally, Defendant asserts the trial court should not have granted the State's Equal Protection objections. Defendant argues that the trial court erred in concluding that the State made a prima facia showing of gender discrimination by the defense in jury selection, and erred in rejecting defense counsel's gender-neutral reasons for using peremptory challenges to remove two female prospective jurors. Defendant urges that the reasons he gave for using peremptory strikes against the two women who were subsequently reinstated to the jury, Ms. Gibbs and Ms. Luczak, were gender-neutral and non-pretextual. The defense contends the trial court's rulings violated Defendant's constitutional rights, and, as a result, his conviction and sentence should be overturned, and the case should be remanded for a new trial.
The State responds that its objection arose when the defense used its strikes to remove all of the women remaining on the jury after the strikes by the State and for cause, and Defendant was subsequently unable to give legitimate neutral reasons for striking the two potential jurors. Thus, the State argues that the trial court's ruling was proper.
In Georgia v. McCollum, 505 U.S. 42, 56, 112 S.Ct. 2348 (1992), the United States Supreme Court held that criminal defendants, like the State, were prohibited from violating jurors' rights to equal protection under Amendment XIV of the United States Constitution through the use of peremptory challenges, and the State had standing to preserve the jurors' Equal Protection rights. "Accordingly, if the State demonstrates a prima facie case of racial discrimination by the defendants, the defendants must articulate a racially neutral explanation for peremptory challenges." McCollum, 505 U.S. at 59, 112 S.Ct. at 2359.
In J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419 (1994), the United States Supreme Court held that gender, like race, is an unconstitutional proxy for bias in determining juror competence and impartiality. Thus, the exercise of peremptory challenges to dismiss potential jurors because of their gender also violates the Equal Protection Clause of the Fourteenth Amendment. Moreover, "[a]ll persons, when granted the opportunity to serve on a jury, have the right not to be excluded summarily because of discriminatory and stereotypical presumptions that reflect and reinforce patterns of historical discrimination." J.E.B., 511 U.S. at 141-42, 114 S.Ct. at 1428. "When an explanation is required, it need not rise to the level of a `for cause' challenge; rather, it merely must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual." J.E.B., 511 U.S. at 145, 114 S.Ct. at 1430. However, "strikes based on characteristics that are disproportionately associated with one gender could be appropriate, absent a showing of pretext." J.E.B., 511 U.S. at 143, 114 S.Ct. at 1429.
The Supreme Court recently re-examined the application of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986) in Snyder v. Louisiana, ___ U.S. ___, 128 S.Ct. 1203 (2008). Under Batson, the party alleging discrimination "must make a prima facie showing that a peremptory challenge has been exercised on the basis of race;" next, the burden shifts to the opposing party to "offer a race-neutral basis for striking the juror in question;" finally, the trial court must determine whether the party alleging discrimination has shown purposeful discrimination. Snyder, 128 S.Ct. at 1207 (quoting Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317 (2005)).
The Snyder court determined that, "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous" because the trial court was in a position to make first-hand observations of the best evidence of discriminatory intent: the demeanor of party employing the peremptory challenge as well as the demeanor of the juror being challenged. Snyder, 128 S.Ct. at 1207-08. Thus, the trial court is in a better position to determine the credibility of the race-neutral explanation. Snyder, 128 S.Ct. 1203.
The U.S. Supreme Court held that the race-neutral reason stated must be both convincing and plausible. Snyder, 128 S.Ct. 1203. If the race-neutral explanation also applies to another potential juror or multiple other potential jurors, but the challenging party declines to peremptorily challenge the other(s), then the challenging party's race-neutral explanation is insincere. Snyder, 128 S.Ct. 1203. Such a pretextual explanation "naturally gives rise to an inference of discriminatory intent." Snyder, 128 S.Ct. at 1212.
"The case law indicates district court decisions on Batson challenges are entitled to deference. This circuit has previously used the `abuse of discretion' standard on review. State v. Rice, 626 So.2d 515 (La.App. 3 Cir.1993)." State v. Dugas, 96-49, p. 11 (La.App. 3 Cir. 10/9/96), 683 So.2d 1253, 1259, writ denied, 96-2652 (La. 4/4/97), 692 So.2d 417. The United States Supreme Court recently rendered an opinion, on March 31, 2009, holding a trial court's good faith error in denying a defendant's peremptory challenge of a juror does not require an automatic reversal of that defendant's conviction; a harmless error analysis applies. Rivera v. Illinois, 556 U.S. ___, 129 S.Ct. 1446 (2009).[4] If all jurors are unbiased and qualified, there has been no due process violation. Id.
After voir dire concluded and the newly-impaneled jury went home, the State objected to the defense's discriminatory use of peremptory challenges:
BY MR. BUCK: [COUNSEL FOR THE STATE]
I think we have  I have an objection to make, your Honor, to [the] exercise [of] the defendant's challenges, preemptory [sic] exceptions. He excluded every female on this jury.
....
BY MS. METOYER: [COUNSEL FOR THE STATE]
He back striked the one on the first, but there's only  there's actually only, uh, one female on the panel, um, that was kept. Every other single  the State cut two females out of all the females on the panel. Uh, actually, when you start talking about the jury panel, the 12 and not the alternate, the State cut one female. Every other female that was cut was cut by the defense. Regardless to, um, their race. It was based upon gender. They were all cut except for one by the defendant.
THE COURT: All right.
BY MR. BUCK:
I think he exercised one challenge against one male, your Honor. THE COURT:
All right. Let the record reflect that if you look at what the defendant turned in  I'm going to recite for the record what sex and [names] of everybody: Dave Coaty was a black male; Rhonda Chapman was a white female. This is Panel # 1. Wayne Rodgers white male; Sheila Rhea white female; Tom Jordan white male; Linda Bonin white female; Delores Rideau was a black female; Robert Allen was a white male; Mary Martin was a white female; Barbara Cockerham was a white female; Mable Emmitt was a white female; Norman Land was a white male; Tammi Robichaux was a white  I said Tammi Robichaux was a white male.
BY MS. METOYER:
White female.
THE COURT:
All right. Female. Bennie Sauseda was a white male; Gloria Carter was a white [fe]male; Irma Leach was a black female; Sherry Kearns was a white female. Out of this group, the State, uh, filed preemptory [sic] challenges against Mable Emmitt Juror # 12 who had no business being on the jury. She was not going to mentally be able to, uh, actually she could have  I should have excused her and filled that box. I didn't realize it until late. Bennie Sauseda was the other challenge, uh, preemptory [sic] challenge filed by the, uh, State. He was a white male.
The defendant in Panel # 1 excused Sheila Rhea a white female; Linda Bonin a white female; Delores Rideau a black female; so that's three. He did a back strike on Mary Martin who is a white female; that would have been four. Norman Land is a white male; Gloria Carter was a white female. Sherry Kearns was a white female. So out of that seven on Panel # 1, six out of seven were females.
Panel # 2 excused by the State was Marvin Veuleman. He was excused by the State and the defendant, and Latoya Quinney who was a black female. She was excused by the State. So, white male, black female. Excused by the defendant was Lloyd McNeely, a white male; Marvin Veuleman a white male; Janet Thompkins a white female; Doris Gibbs white female; Christine Luczak is a white female; and a Maurine
Dubois who was a white female. So I believe out of all of his challenges, he's had three, three white males  three males, nine females. And the State used four  two for males, two for females. Do you think that that is a prima fascia [sic] showing?
BY MR. BUCK:
I believe it's a prima fascia [sic] showing. It's intent to strike by gender, your Honor.
Yes, because I think not only that you would have to take it by the order that they are offered in, too. If the Court considers that he struck every female as they came.
BY MS. METOYER:
And then went and back striked...
BY MR. BUCK:
Back striked the only woman he left.
THE COURT:
Well, let's look to see who was selected. We have Dave Coaty who is a male; Wayne Rodgers a male; Tom Jordan a male; Robert Allen a male; Bradford Mason a male. We have Tammi Robichaux that was selected.
[COURT REVIEWS CHALLENGES]
THE COURT:
Do you have whether or not Sherry Kearns was selected by the defendant?
BY MR. BUCK:
She was allowed to, uh, stay, your Honor. She is jur[or] # ...
THE CLERK:
Number 7.
....
THE COURT:
All right. So she was juror # 7, so, there's two females from the first panel that he allowed to remain. . . .
BY MS. METOYER:
Correct, your Honor, I believe those are the only two females because there were three originally, and he back striked one. He cut them all on the second panel. They didn't select any females from the second panel whatsoever.
THE COURT:
Melder is a male; Verzwyvelt is a male; Shane Stokes is a male; Hanes is a male; Jason Wells is a male.
BY MR. BUCK:
Your Honor, I don't have the new case on that, but I believe that it's not enough anymore just to ___. If I allowed, uh, one certain juror or type of juror to stay, um, the Court says you must look a little bit further than that.
BY MR. WILLIAMS: [COUNSEL FOR THE DEFENSE]
Any of y'all know what the new cases say on that, but I believe that all I need is an independent reason to, uh, strike whoever I wanted to strike, that is race neutral.
THE COURT:
All right. Well, let me hear it then.
....
THE COURT:
I'm going to find that there's a pattern, and this is a prima fascia [sic] case, so I want you to explain neu  a gender neutral reason why you've excused the people you've excused.
The Louisiana Supreme Court has abided by the three-part test set forth in Batson for determining whether the party objecting to the challenges established a prima facie case of discrimination: (1) the peremptory challenges must be directed at members of a cognizable racial and gender group; (2) the challenges must have been peremptory rather than for cause; and (3) the objecting party must show circumstances sufficient to create an inference that the peremptory challenge was used to strike the venire person based on his membership in that cognizable group. State v. Duncan, 99-2615(La. 10/16/01), 802 So.2d 533, cert. denied, 536 U.S. 907, 122 S.Ct. 2362 (2002).
Under La.Code Crim.P. art. 799, each party had twelve peremptory challenges in the instant case. The record shows that Defendant used all twelve of his peremptory challenges to challenge three males and nine females. Thus, we find that the three to one ratio of women to men challenged by Defendant supports the trial court's conclusion that the State successfully presented a prima facie case of gender discrimination by Defendant. Therefore, the trial court did not abuse its discretion in proceeding to the second step of the Batson test.
The defense then explained its gender-neutral reasons for challenging the female potential jurors; it made the following statements regarding Ms. Gibbs and Ms. Luczak:
THE COURT:
Doris Gibbs?
MS. METOYER:
She's the one that works at Star Tek.
THE COURT:
And her husband works at the VA.
BY MS. METOYER:
Correct.
THE COURT:
Come on, hurry up and think of one.
BY MR. WILLIAMS:
I'm trying to read my writing. I've got that she's a supervisor for Star Tek. That wouldn't be a reason I don't believe. Her brother, uh, committed a crime for worthless checks. There is a little note here  I can't figure out what it is.
THE COURT:
Well, she was talking about . . . . it was in Missouri...
BY MR. WILLIAMS:
She asked a lot-I've got here questions, is what I've got written here, which is a lot  either she asked a lot of questions, or I had questions about her, so, I cut her.
THE COURT:
All right.
BY MS. METOYER:
Christine Luczak.
THE COURT:
Uh, Christine Luczak the little girl that works at Spirits.
BY MS. METOYER:
Single with no children.
BY MR. WILLIAMS:
That's right. She's still attractive, and I didn't want my jurors distracted.
THE COURT:
Are you serious?
BY MR. WILLIAMS:
Yes, I'm serious. It's a reasonable reason. It's a race, gender and true reason.
BY MR. BUCK:
It must be a gender reason. You kept all of the good-looking guys.
BY MR. WILLIAMS:
I don't know of any good-looking guys.
....
BY MR. BUCK:
By striking all of the women you don't have to worry about  BY MR. WILLIAMS:
I will be more than happy to bring Christine Luczak back.
BY MR. BUCK:
Okay, then.
The trial court found the defense failed to state adequate gender-neutral reasons for both Ms. Gibbs and Ms. Luczak. Further, the trial court found that Ms. Gibbs's having a brother arrested for issuing worthless checks in Missouri was not a reason to challenge Ms. Gibbs. Additionally, the court determined the defense could not challenge a woman because she was too attractive. Based on its findings, the trial court granted the State's motions as to Ms. Gibbs and Ms. Luczak. Defendant objected to the inclusion of both women on the jury.
On January 11, 2006, prior to opening statements, the trial court identified the resulting jurors and alternate juror for the record. Following the reinstatement of Ms. Gibbs to the jury, the jurors in Defendant's trial consisted of nine men and three women, with Ms. Luczak served as the alternate juror.
The defense asserts the trial court should have accepted its gender-neutral reasons for challenging Ms. Gibbs and Ms. Luczak.
If a race-neutral [or gender neutral] reason is given, the trial court must then decide whether the challenger has proven purposeful discrimination. Whether there has been intentional racial [or gender] discrimination is a question of fact. The decisive question in the analysis is whether the race-neutral [or gender neutral] reason should be believed. A reviewing court owes the trial court's evaluations of discriminatory intent great deference and should not reverse unless the evaluations are clearly erroneous.
State v. Scott, 04-1312, p. 44 (1/19/06), 921 So.2d 904, 937, cert. denied, 549 U.S. 858, 127 S.Ct. 137 (2006) (citations omitted).[5]
The basis Defendant gave for striking Ms. Gibbs was, ultimately, her brother's being arrested for issuing worthless checks. Based on the trial court's statement, "Come on, hurry up and think of one," the trial court seemed to believe defense counsel was struggling to invent a gender-neutral reason for challenging Ms. Gibbs. The subsequent verbal exchange showed defense counsel eventually read, or attempted to read, all of the notes he had taken on Ms. Gibbs in an attempt to allege a gender-neutral basis for the peremptory challenge.
The defense's stated reasons for the challenge do not automatically signal prejudice or impartiality on Ms. Gibbs' behalf, and Defendant did not explain why Ms. Gibbs's brother's arrest for an unrelated, nonviolent crime in Missouri would indicate prejudice. The record shows Ms. Gibbs specifically said her brother's arrest would not affect her ability to be fair and impartial. In contrast, both Mr. Hanes and Mr. Melder went unchallenged after they stated they, personally, had both been charged with aggravated assault though the charges had subsequently been dismissed.
The defense also stated that one of its reasons for challenging Ms. Gibbs was either it had questions about her for some reason it did not recollect or she asked a lot of questions. The record before this court shows that Ms. Gibbs did not ask questions during voir dire. Hence, Defendant's gender-neutral reasons for challenging Ms. Gibbs were pretext, i.e. they were not related to the case and neither convincing nor plausible. Thus, we find that the trial court did not abuse its discretion when it granted the State's equal protection objection insofar as it applied to Ms. Gibbs.
The reason Defendant gave for challenging Ms. Luczak was that her attractiveness would distract the other jurors. At the time of the equal protection objection, the jury consisted of ten men, two women, and one male alternate juror. We find that, under those circumstances, challenging a female prospective juror because her beauty would be distracting to the other jurors, who were mostly male, is not gender-neutral. This is reinforced by the information derived from the State's response to Defendant's explanation; the prosecution stated for the record that the defense had failed to challenge any of the attractive male prospective jurors. Moreover, the defense also eventually seemed to recognize the inherent gender-bias in its explanation by volunteering to allow Ms. Luczak back onto the jury although it subsequently objected to Ms. Luczak's inclusion as a juror.
Because the defense failed to give a gender-neutral reason for challenging Ms. Luczak, we hold that the trial court also did not abuse its discretion when it granted the State's equal protection objection insofar as it applied to Ms. Luczak. Accordingly, this assignment of error is without merit.

CONCLUSION:
We affirm Defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] Pursuant to La.R.S. 46:1844(W)(1)(a), it is not necessary to preserve the victim's identity as the victim is deceased.
[2] Detective Keith McLain, who testified as the fourth witness for the prosecution, assisted Lieutenant Washington in investigating Christopher's death; however, his testimony did not add any information useful to resolving the assignments of error presented by the defense.
[3] 2009 WL 130278.
[4] 2009 WL 815033. Although the volume number is not indicated on Westlaw, the volume number was obtained from the slip opinion issued by the Supreme Court: "Cite as: 556 U.S. ___ (2009)."
[5] Our supreme court has overruled an unrelated point of law in this case. State v. Dunn, 07-878 (La. 1/25/08), 974 So.2d 658.